**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4633**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL LAMONT MATHIS, a/k/a Gunna, a/k/a Mooch, a/k/a D-Man,

Defendant - Appellant.

**No. 16-4635**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MERSADIES LACHELLE SHELTON, a/k/a Lady Gunns, a/k/a Maisha Love
Uhuru,

Defendant - Appellant.

**No. 16-4637**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHANTAI MONIQUE SHELTON, a/k/a Tai, a/k/a Lady Blaze, a/k/a Boss Lady,

> Defendant - Appellant.

---

**No. 16-4641**

---

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

> v.

KWELI UHURU, a/k/a Travis Leon Bell, a/k/a K. Gunns, a/k/a Black Wolf, a/k/a Babi,

> Defendant - Appellant.

---

**No. 16-4837**

---

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

> v.

ANTHONY DARNELL STOKES, a/k/a Face, a/k/a Black Face, a/k/a Kenyata Baraka,

> Defendant - Appellant.

---

**No. 16-4838**

---

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

v.

HALISI UHURU, a/k/a Arthur Lee Gert Wright, a/k/a Gritty, a/k/a Bones, a/k/a Big Homey,

Defendant - Appellant.

Appeals from the United States District Court for the Western District of Virginia, at Charlottesville. Glen E. Conrad, District Judge. (3:14-cr-00016-GEC-JCH-1; 3:14-cr-00016-GEC-JCH-2; 3:14-cr-00016-GEC-JCH-3; 3:14-cr-00016-GEC-JCH-4; 3:14-cr-00016-GEC-JCH-6; 3:14-cr-00016-GEC-JCH-7)

Argued: January 24, 2018                                      Decided: July 31, 2019

Before KEENAN and DIAZ, Circuit Judges, and DUNCAN, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Diaz and Senior Judge Duncan joined.

**ARGUED:** Frederick T. Heblich, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant Daniel Lamont Mathis. Paul Graham Beers, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellant Anthony Darnell Stokes. Christopher R. Kavanaugh, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Larry W. Shelton, Federal Public Defender, Roanoke, Virginia, Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Paul G. Gill, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia; Aaron Lee Cook, Harrisonburg, Virginia; David Anthony Eustis, Charlottesville, Virginia; Rhonda E. Quagliana, Charlottesville, Virginia; Michael T. Hemenway, Charlottesville, Virginia; Sherwin John Jacobs, Harrisonburg, Virginia, for Appellants. Rick A. Mountcastle, Acting United States Attorney, Roanoke, Virginia, Ronald M. Huber, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

This case involves the prosecution of several members of a violent street gang known as the Double Nine Goon Syndikate (DNGS). After a multi-week trial, a jury convicted Halisi Uhuru (Halisi), Anthony Stokes (Stokes), Kweli Uhuru (Kweli), Mersadies Shelton (Mersadies), Shantai Shelton (Shantai), and Daniel Mathis (Mathis) (collectively, the defendants) of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), based on their activities related to the gang.

Mathis, Shantai, Mersadies, and Kweli (collectively, the capital defendants) also were convicted, in relation to the murder of an off-duty police officer, of violent crimes in aid of racketeering activity in violation of 18 U.S.C. § 1959 (VICAR) by committing kidnapping and murder under Virginia law, as well as witness tampering by means of murder in violation of 18 U.S.C. § 1512(a). The capital defendants were sentenced to serve terms of life imprisonment. Halisi and Stokes additionally were convicted of obstruction of justice in violation of 18 U.S.C. § 1512(c)(1).[1]

On appeal, the defendants raise several challenges concerning their trial and sentences. Upon our review of these arguments, we vacate in part with respect to the capital defendants' convictions that are predicated on commission of kidnapping under Virginia

---

[1] The other crimes of conviction include Hobbs Act robberies in violation of 18 U.S.C. § 1951(a), VICAR offenses in violation of 18 U.S.C. § 1959, and various convictions for the use or carry of a firearm during and in relation to a violent crime in violation of 18 U.S.C. § 924(c).

4

law.  Accordingly, we also remand the capital defendants' convictions for resentencing. We affirm the balance of the district court's judgments.

I.

The Bloods is a nationwide street gang.[2]  Groups of Bloods are organized into "sets" or smaller, individual groups of Bloods.  One of these sets, DNGS, was founded by Halisi, Stokes, and Kweli in 2013 during their incarceration for crimes unrelated to the present case.

DNGS operates through a hierarchical structure.  Halisi served as "high OG" or "Double OG," DNGS's leader.  Stokes was second in command as "low [OG]."  Kweli also held a leadership role with the rank of "OG," "Big Homey," or a "Low 020."  Another DNGS leader was responsible for operations conducted by incarcerated DNGS members. These four individuals composed DNGS's "Roundtable," or leadership council.  Reporting to the council were members organized by rank, including sergeant, lieutenant, and major. New DNGS members held the title of "soldier."

Upon gaining membership into the gang, members were given notebooks to study that included the rules and the history of the Bloods gang and the DNGS set.  Gang members communicated using certain codes and phrases in an effort to ensure that their communications remained incomprehensible to law enforcement authorities and others.

---

[2] We set forth the facts in the light most favorable to the government, the prevailing party at trial.  *Evans v. United States*, 504 U.S. 255, 257 (1996).

Members outwardly reflected their association with the Bloods and DNGS by wearing red clothing items, including red bandanas, and by obtaining tattoos reflecting gang insignia.

DNGS financed itself through the proceeds of various illegal activities undertaken by members, including armed robberies, home invasions, and burglaries. Members were expected to "put in work" to advance their rank in the gang, that is, to commit crimes in order to show their commitment and loyalty. If a member refused to "put in work," that member likely would have been "violated," or beaten.

Both while imprisoned and after their release, Stokes, Kweli, and Halisi began recruiting new members to the newly formed DNGS set, including Shantai, Mersadies, and Mathis. As the gang's membership grew, DNGS members "put in work" committing a series of crimes from late 2013 into early 2014. This spree of illegal activities included a number of armed robberies of convenience stores, home invasions, burglaries, and other crimes committed in central Virginia.

On the night of January 31, 2014, the capital defendants attacked Kevin Quick (Quick), an off-duty reserve captain with the Waynesboro, Virginia, Police Department, as he was departing his vehicle. The four defendants compelled Quick back into his vehicle at gunpoint, drove him to a nearby ATM, and forced him to withdraw money from his account. After learning that Quick was a police officer, and realizing that Quick had "already seen their face[s]," the capital defendants decided that "it was too late . . . to let [Quick] go." They drove Quick to a remote area off the main roadway, removed Quick

from the car, and fired a single shot into Quick's head, killing him and leaving his body behind.[3]

The next day, the capital defendants met with Halisi and Stokes in Manassas, Virginia.  The defendants rented two hotel rooms to host a "B-House," or a meeting of DNGS members.  Throughout that day, the defendants and other DNGS members discussed potential drug trafficking plans and engaged with other drug dealers in transactions involving the distribution of quantities of drugs, including crack cocaine.

The capital defendants left the hotel the next morning and drove in Quick's vehicle to Front Royal, Virginia.  Concerned that the vehicle could link them to the murder, the capital defendants bought bleach, rubber gloves, and a jug to hold gasoline for setting the vehicle on fire.  Leaving Kweli behind, Mathis, Shantai, and Mersadies drove the vehicle to a friend's house where they cleaned the vehicle with bleach.

Later that day, Mathis and Mersadies committed a robbery.  During the robbery, Mathis fired one shot from his pistol.  Investigators later recovered a bullet and a cartridge from the scene of this robbery and matched these items through forensic testing to the weapon used in Quick's murder and a previous robbery.

Mathis and Mersadies quickly left the scene of the robbery in Quick's vehicle, which malfunctioned shortly thereafter.  They pushed the disabled vehicle to a nearby driveway and doused the vehicle with additional bleach.  After receiving a call from Mersadies asking for help, Halisi and Stokes decided that Stokes would drive to meet

---

[3] The record does not show which of the capital defendants fired the fatal shot.

Mersadies and Mathis, as well as Shantai, who had reunited with Mersadies and Mathis. Once Stokes reached the group, Mathis and Shantai told him that Quick's vehicle needed to be destroyed, but Stokes stated that they would "find a way to get rid of it the next day."

Stokes and Halisi later obtained a hotel room in which Mersadies, Mathis, and Shantai could "hide out."[4] As Quick's disappearance became publicized, Mersadies, Mathis, and Shantai discussed absconding to Montana to avoid being arrested. Mersadies informed Kweli of these discussions through frequent text messages.

While Kweli was attempting to have Quick's vehicle destroyed, law enforcement officers located the abandoned vehicle. Evidence technicians recovered the following evidence from the vehicle: Kweli's fingerprint on Quick's driver's license, which was found in Quick's wallet inside the vehicle; fingerprints belonging to Mathis, Shantai, and Mersadies on the vehicle or on items within the vehicle; Mersadies' DNA on a piece of chewing gum left in the vehicle's ashtray; and Mathis' DNA on rubber gloves left in the vehicle.

Once news media reported that Quick's vehicle had been recovered, the defendants planned their escape to Montana and destroyed other evidence related to their crimes. Halisi ordered Leslie Casterlow (Casterlow), who frequently acted as a drug courier for DNGS, to "get rid of" Quick's ATM card. Kweli ordered the other defendants to delete any incriminating text messages. Also, Shantai and one other DNGS member disassembled the gun used to kill Quick and placed the gun components in a pillowcase.

---

[4] At this time, the defendants were spread out over various locations in Northern Virginia.

8

A day after Quick's vehicle was recovered, Mathis, Shantai, and Mersadies were arrested at the hotel. After hearing news of the arrest, Halisi had his girlfriend destroy both his and Casterlow's phones. Casterlow, who still had possession of the murder weapon parts, hid those items behind a dumpster at their hotel.

During this time, Stokes was traveling to Washington, D.C. and Maryland to purchase narcotics with an associate, Jamar Rice (Rice), who later became a government witness. After receiving information from an unidentified caller that law enforcement had raided the hotel[5] to which Stokes was returning after his trip with Rice, Stokes told Rice that his "homies" had carjacked and killed a police officer, and had left his body in the woods.

Stokes returned to Virginia to pick up Halisi, Halisi's girlfriend, and Casterlow. Stokes told Casterlow to retrieve the murder weapon components from behind the dumpster and to drive the group to a nearby interstate highway. As Casterlow drove along the highway, Stokes threw the murder weapon parts over the wall bordering the road. Thereafter, Halisi, Stokes, and Casterlow were arrested at the hotel. Law enforcement officers later recovered the weapon parts with Casterlow's assistance.

The defendants were charged in a 36-count indictment with conspiring to participate in a racketeering enterprise that included the commission of assaults, robberies, burglaries, kidnapping, carjacking, murder, drug trafficking, and obstruction of justice. After the jury was sworn during the first trial, the district court was informed that Kweli had removed

---

[5] During this raid, law enforcement officers arrested Mathis, Mersadies, and Shantai.

from the courtroom a jury list containing identifying information about the jury panel members and their families. The district court thereafter granted the defendants' motion for a mistrial.

A second trial was held in the Roanoke Division of the Western District of Virginia following a request by some of the defendants to change venue. The district court also granted the government's request to empanel an anonymous jury. At the close of the second trial, a jury found the defendants guilty on all counts. The district court later sentenced the capital defendants each to serve a term of life imprisonment. Halisi and Stokes received sentences of 144 and 160 months' imprisonment, respectively. Several other sentences were imposed on the various defendants. This appeal followed.

## II.

## A.

The defendants first argue that the district court committed reversible error in deciding to empanel an anonymous jury. According to the defendants, there was no evidence supporting the district court's finding that the defendants had the capacity to harm or to intimidate the jurors.

We review a district court's decision to empanel an anonymous jury for abuse of discretion. *United States v. Dinkins*, 691 F.3d 358, 371 (4th Cir. 2012). In a capital case, a district court may empanel an anonymous jury only after determining "by a preponderance of the evidence that providing the [juror] list . . . may jeopardize the life or safety of any person." *Id.* at 372 (citing 18 U.S.C. § 3432). We choose to apply this strict

standard to both the capital defendants and the non-capital defendants, because the test is satisfied for both groups.

A district court must base its decision to empanel an anonymous jury on evidence in the record, rather than solely on the allegations in the indictment. *Id.* at 373. Use of an anonymous jury is appropriate "only in rare circumstances when two conditions are met: (1) there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised absent anonymity; and (2) reasonable safeguards have been adopted to minimize the risk that the rights of the accused will be infringed." *Id.* at 372 (citations omitted).

To determine whether there are "strong reason[s]" for empaneling an anonymous jury, we consider five factors:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id.* at 373 (citing *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir. 1994)). These factors are not exhaustive but are meant to provide guidance in the district court's fact-specific inquiry. *Id.*

In the present case, during the first trial, the district court raised the question whether use of an anonymous jury would be appropriate. When the defendants stated their opposition, the court took no further action. However, as noted above, the court later received information that Kweli had removed the jury panel list containing the members'

11

personal information and had kept the list overnight in the jail. After the court informed the jury members that the jury list had been retained by a defendant overnight, some of the defendants moved for a mistrial, which the court granted.

In view of these events, the government filed a motion at the beginning of the second trial requesting an anonymous jury. The district court granted the government's motion.

Applying the standards outlined in *Dinkins* and reviewing the district court's reasoning, we conclude for several reasons that the district court did not abuse its discretion in having the case heard by an anonymous jury. First, the indictment alleged that the defendants were members of a violent street gang and were involved in a number of violent criminal offenses, including witness tampering by murder. The record contained sworn statements by various cooperating witnesses and DNGS members corroborating these allegations. This evidence strongly suggested that the defendants had associates who were not incarcerated and could intimidate or harm the jurors. *See Ross*, 33 F.3d at 1520.

Second, FBI special agent Scott Cullins expressed to the court concerns about juror safety given the gang's "history of not only retribution, but also preventative actions." Moreover, Deputy United States Marshal Mark Haley informed the court that at least two defendants, Kweli and Halisi, had continued their DNGS recruitment efforts from jail while awaiting trial. The circumstances leading to the mistrial thus more than justified the court's concern for juror safety. And third, if convicted, several of the defendants faced lengthy incarceration and substantial penalties that may have induced them to intimidate the jury in an attempt to influence the outcome of the trial. *See id.* at 1520–21.

We also observe that the district court adopted reasonable safeguards to minimize the risk that the defendants' constitutional rights would be infringed by the use of an anonymous jury. *Dinkins*, 691 F.3d at 378. The court provided the venire members with a neutral, non-prejudicial explanation of its decision that minimized the danger of prejudice to the defendants. *See United States v. Hager*, 721 F.3d 167, 188 (4th Cir. 2013). And the court's decision did not interfere with the defendants' ability to conduct a thorough voir dire examination. Counsel were given full access to all juror information, and the defendants were permitted to review redacted juror questionnaires. Accordingly, upon our consideration of all the facts and circumstances before the district court, we hold that the court's decision to empanel an anonymous jury was supported by a preponderance of the evidence and, thus, was not an abuse of discretion.

### B.

Before the jury heard evidence in the case, the court considered pretrial motions seeking the admission of a number of inculpatory co-conspirator statements. The court ultimately overruled the defendants' objections and received the statements into evidence during the trial. The defendants argue that the district court erred in admitting three of these statements, because they were not made in furtherance of the charged RICO conspiracy, and their admission violated the defendants' rights under the Confrontation Clause as detailed in *Crawford v. Washington*, 541 U.S. 36 (2004). We disagree with the defendants' arguments.

### 1.

We review the district court's decision to admit co-conspirator statements for abuse of discretion. *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013). To introduce a co-conspirator's statements under Federal Rule of Evidence 801(d)(2)(E), the government was required to show by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included both the declarants and the defendants against whom the statements were offered, and (3) the statements were made during the course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

The government proffered that it would establish that the statements were made during and in relation to the broader DNGS racketeering conspiracy, which included Quick's murder and the ensuing actions to avoid detection and arrest.[6] Shantai made the first challenged statement the morning after Quick's murder, giving Anthony White (White), another DNGS member, a detailed account of the kidnapping and murder. This statement included the fact that the capital defendants killed Quick, because "they found out he was a cop." Both White and Shantai were members of the conspiracy. Although White had not participated in Quick's murder, the statement provided information to White on the status of the DNGS criminal enterprise, of which he was a member. *See United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (noting that statements made between co-conspirators to "inform each other as to the progress or status of the conspiracy" are

---

[6] We find no merit in the defendants' argument that Quick's kidnapping and murder and the later cover-up of those crimes were not part of the DNGS racketeering conspiracy. As noted, the government's proffer alleged that Quick's murder was one of many racketeering acts done on behalf of the broader DNGS conspiracy. And our review of the record evidence, discussed more fully below in Section II.E., leads us to conclude that Quick's kidnapping and murder were part of the larger-scale DNGS conspiracy.

14

statements made in furtherance of that conspiracy). Accordingly, Shantai's statement to White was admissible as a statement of a co-conspirator made "in furtherance of the conspiracy."

Kweli made the second challenged statement while he and Halisi were arranging for someone to destroy Quick's vehicle. Kweli called Shiquan Jackson (Jackson), a DNGS member, to inform him of the situation. Kweli told Jackson that "[Kweli] just did something bad," and that he and the other capital defendants "just peter-rolled [i.e. killed] a cop" and had to "lay low." During this conversation, Kweli asked Jackson and Jackson's brother, Devante Jackson, also a DNGS member, to contact Halisi, find the vehicle, and quickly dispose of it. Again, all parties to this statement were members of the conspiracy, and Kweli's comments to Jackson were made in furtherance of the conspiracy. Not only was Kweli providing Jackson information regarding the status of the conspiracy, but he also sought to "induce a coconspirator's assistance" to destroy evidence for the purpose of evading detection and arrest. *Id.* Thus, because Kweli's statement to his fellow DNGS member was intended to "prolong the unlawful activities" of the DNGS enterprise, *United States v. Altomare*, 625 F.2d 5, 8 n.9 (4th Cir. 1980), this statement was admissible under Rule 801(d)(2)(E).

The third challenged statement involves comments Mathis made to his girlfriend, Dierra Lloyd (Lloyd), who was not a DNGS member. After Quick's murder, Mathis confessed to Lloyd that he and the other capital defendants "killed a cop." Mathis also

15

asked Lloyd if she "knew a place where [he] could get rid of [Quick's vehicle]."[7] Although this statement was not made to a member of the DNGS enterprise, we have recognized that "even casual relationships to the conspiracy" will satisfy the nexus requirement of Rule 801(d)(2)(E). *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006) (citation omitted). This statement also was made "in furtherance of the conspiracy" because Mathis sought Lloyd's assistance in disposing of Quick's vehicle. *See Mandell*, 752 F.3d at 552 (citation omitted). Therefore, Mathis' statement likewise was admissible under Rule 801(d)(2)(E).

2.

We turn to address the defendants' contention that the admission of the co-conspirator statements violated their rights under the Confrontation Clause. We review de novo this question of law. *United States v. Lighty*, 616 F.3d 321, 376 (4th Cir. 2010).

The Confrontation Clause protects a defendant's right to cross-examine a declarant making a "testimonial" statement. *Davis v. Washington*, 547 U.S. 813, 821 (2006). Although the Supreme Court has not articulated a precise definition of the term "testimonial," the Court has provided concrete examples of testimonial evidence. At a minimum, such evidence includes testimony given at a preliminary hearing, before a grand jury, and at a formal trial, as well as statements made during a police interrogation. *See Crawford*, 541 U.S. at 68. More recently, the Court has explained that a statement is testimonial in nature if the statement was made or procured with the "primary purpose" of

---

[7] It is not clear from the trial record whether Lloyd helped Mathis and the other members destroy the vehicle following Mathis' request.

16

creating an "out-of-court substitute for trial testimony." *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)).

We conclude that the challenged co-conspirator statements were not testimonial in nature. The defendants made the challenged statements to co-conspirators and to Lloyd about criminal activities related to the DNGS criminal enterprise. Moreover, all the statements were made in furtherance of that criminal conspiracy and were not intended to be used as a substitute for trial testimony. Accordingly, the admission of the challenged statements did not violate the defendants' rights under the Confrontation Clause.[8] *See United States v. Jordan*, 509 F.3d 191, 194, 201 (4th Cir. 2007) (holding that statements made by declarant and alleged co-conspirator to the declarant's friend describing events related to the murder of a drug courier were non-testimonial and, thus, did not violate the Confrontation Clause).

## C.

The defendants next contend that the indictment was defective because it charged that Quick was prevented from communicating "to a law enforcement officer," rather than "to a law enforcement officer . . . of the United States," as provided in the language of 18 U.S.C. § 1512(a)(1)(C). The district court did not reach the merits of this argument, determining that the defendants' motion to dismiss the witness tampering count and related

---

[8] Given that admission of the co-conspirator statements did not violate the Confrontation Clause, we reject the defendants' additional claim under *Bruton v. United States*, 391 U.S. 123 (1968). *United States v. Dargan*, 738 F.3d 643, 651 (4th Cir. 2013) ("Statements that do not implicate the Confrontation Clause, *a fortiori*, do not implicate *Bruton*.").

17

Section 924(c) count was untimely and that they failed to establish "good cause" to excuse their untimely filing.

The defendants concede that their motion to dismiss was untimely but argue that they had good cause for the untimely filing, because some of the defendants' attorneys were unaware of the alleged defect in the indictment. The defendants alternatively maintain that despite their untimely motion, this Court may review the merits of their argument for plain error, and conclude under that standard that the indictment was defective. We conclude that the defendants failed to show good cause and that, in any event, there was no defect in the indictment.

We review the district court's finding of lack of good cause for abuse of discretion. *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015); *cf. United States v. Cowley*, 814 F.3d 691, 698 (4th Cir. 2016) (reviewing for abuse of discretion the district court's finding that defendant did not establish good cause to rebut the presumption of untimeliness under the Innocence Protection Act). Under Federal Rule of Criminal Procedure 12, a challenge to a defect in an indictment "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."[9] Fed. R. Crim. P. 12(b)(3)(B). If a party fails to meet this deadline, the motion is

---

[9] This version of Rule 12 took effect on December 1, 2014, a few weeks after the indictment was returned by the grand jury. The defendants do not argue that the prior version of Rule 12 applies. In any event, we determine that the current version of Rule 12 applies, because this case was pending at the time the Rule took effect and the Rule's application is "just and practicable." *See* S. Ct. Order Amending Fed. R. Crim. P. at ¶ 2 (Apr. 25, 2014) (providing that the new rules "shall govern in all proceedings in criminal cases thereafter commenced and, insofar as just and practicable, all proceedings then pending").

untimely. *Id.* 12(c)(3). A district court "may consider" an untimely motion only if the moving party "shows good cause" for its delayed action. *Id.*

We conclude that the district court did not abuse its discretion in finding that the motion was untimely, and that the defendants failed to show good cause for their delayed challenge. Mathis' counsel informed the court that he had "held onto" the perceived defect in the indictment "for quite [awhile]" because of his "hope that [he] would get into serious plea negotiations with the government, and that if [he] did get in serious plea negotiations with the government, that [he] could get some mileage out of it." Counsel further admitted that he "could have filed [the motion to dismiss] right before trial, [he] could have filed it before the jury was picked, [he] could have filed it any of those times, and [he] didn't."

A party's affirmative decision to delay filing a motion in an attempt to gain a strategic advantage at trial does not amount to good cause for purposes of Rule 12. *See United States v. Ramirez*, 324 F.3d 1225, 1228 (11th Cir. 2003) (holding that defense tactic of "sandbagging" is not good cause for failure to file motion to dismiss (citation omitted)); *see also United States v. Oldfield*, 859 F.2d 392, 397 (6th Cir. 1988) (noting that one purpose of Rule 12 is to "restrict[] the defense tactic of 'sandbagging'" (citation omitted)). Accordingly, we affirm the district court's denial of the defendants' untimely motion to dismiss the witness tampering charge and the related Section 924(c) counts of the indictment.[10]

---

[10] We are not persuaded by the defendants' argument that there was good cause for the untimely motion because some attorneys for the other defendants were unaware of the alleged defect. *See United States v. Ruhe*, 191 F.3d 376, 386–87 (4th Cir. 1999) (holding (Continued)

More fundamentally, there was no defect, plain or otherwise, in the indictment. Generally, an indictment is sufficient if it "(1) indicate[s] the elements of the offense and fairly inform[s] the defendant of the exact charges and (2) enable[s] the defendant to plead double jeopardy in subsequent prosecutions for the same offense." *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998) (citation omitted). The fact that the language at issue in the indictment did not track the precise language of the statute did not constitute error under these circumstances. *Id.* The indictment detailed the factual basis for the witness tampering charge and cited to the correct statute, fairly apprising the defendants of the crime charged and its required elements. *Id.* Therefore, we reject the defendants' claim of error.

## D.

The defendants next argue that the district court violated their Fifth Amendment rights by amending the indictment through the court's instructions to the jury. According to the defendants, although the indictment alleged that the Bloods gang was the criminal enterprise underlying the RICO charge, the court instead instructed the jury that DNGS was the alleged enterprise.

We do not address the merits of this argument because the defendants invited the claimed error. *United States v. Herrera*, 23 F.3d 74, 75 (4th Cir. 1994) ("[A] court can not be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request." (quoting *Shields v. United States*, 273 U.S. 583, 586 (1927))).

that there was no good cause to raise an untimely suppression motion when the defendant could have with due diligence discovered the information necessary to raise the issue).

20

At the charging conference near the end of the trial, the defendants argued that the jury should be instructed that the alleged enterprise was only the Bloods, and did not include DNGS. The government noted that the indictment referred to the Bloods and DNGS interchangeably and ultimately offered, with the district court's approval, that the exact language contained in the indictment be used in the jury instructions. Nonetheless, the defendants declined this proposed course of action and requested that the instructions naming only DNGS be used. Thus, even if the court's instruction was improper, the defendants could have cured any such error but did not.[11] *See United States v. Lespier*, 725 F.3d 437, 445–46, 449–51 (4th Cir. 2013) (holding that the invited error doctrine applies when the defendant opposed provision of a particular instruction and then argued on appeal that it was error for instruction not to have been given).

E.

The defendants challenge the sufficiency of the evidence to convict them of the RICO conspiracy under 18 U.S.C. § 1962(d).[12] The capital defendants also argue that their federal witness tampering convictions under 18 U.S.C. § 1512(a)(1)(C) are not supported

---

[11] The defendants do not argue that an exception to the invited error doctrine is applicable in this case. *See United States v. Lespier*, 725 F.3d 437, 450–51 (4th Cir. 2013).

[12] The defendants also challenge the sufficiency of the evidence underlying their numerous VICAR convictions under 18 U.S.C. § 1959(a)(3), and violations of 18 U.S.C. § 924(c), based on the underlying VICAR offenses. VICAR imposes criminal liability on an individual who commits a crime of violence "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). As Section 1959(a) incorporates the same definition of "enterprise" as RICO, 18 U.S.C. § 1959(b), our analysis of the defendants' challenge to the RICO conspiracy convictions applies equally to the VICAR and related Section 924(c) convictions.

21

by the evidence. Additionally, Halisi and Stokes challenge the sufficiency of the evidence to support their convictions for obstruction of justice under 18 U.S.C. § 1512(c)(1).

We will sustain a jury's verdict when there is substantial evidence, construed in the light most favorable to the government, supporting the verdict. *United States v. Hackley*, 662 F.3d 671, 678 (4th Cir. 2011). We address the defendants' arguments in turn, setting forth additional facts as necessary to decide each argument.

1.

The defendants each were convicted of conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d). To obtain a conviction under this statute, the government was required to prove "that an enterprise affecting interstate commerce existed; that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and . . . that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (citations and internal quotation marks omitted).

a.

The defendants argue that: (1) DNGS was not an "enterprise," as the term is used in the RICO statute; and (2) their crimes were "unplanned, disorganized, and spontaneous" and, thus, did not constitute a pattern of racketeering activity. We find no merit in either argument.

The RICO statute defines the term "enterprise" as "any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise

22

"is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function[ed] as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The Supreme Court has explained that an "association-in-fact enterprise" must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Here, the government presented sufficient evidence from which a reasonable jury could conclude that DNGS was an "enterprise," within the meaning of the RICO statute. DNGS members received tattoos and wore red clothing signifying their membership in the gang, congregated regularly at membership meetings, and had a set of governing rules that members were expected to follow. Members shared a common function and purpose, namely, to enrich members of the gang by "putting in work" through the commission of violent crimes and selling drugs. DNGS members also agreed to provide, and did provide, protection for one another. Although an "enterprise" "need not have a hierarchical structure or chain of command," *id.* at 948, the presence of such organizational features provides additional evidence of a functioning "enterprise." And here, the government's evidence established that DNGS had a clearly delineated leadership structure.

Although the RICO statute does not define the phrase "pattern of racketeering activity," *see* 18 U.S.C. § 1962, the statute specifies that proof of a "pattern of racketeering activity" requires evidence of "at least two acts of racketeering activity" committed within a ten-year period, 18 U.S.C. § 1961(5). The Supreme Court further has explained that to establish a pattern of racketeering activity, the racketeering predicate acts must be related

23

to each other (the "relatedness prong"), and must amount to, or pose a threat of, continued criminal activity (the "continuity prong"). *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) ("It is this factor of *continuity plus relationship* which combines to produce a pattern." (citation omitted)).

At issue here is the relatedness prong of the pattern analysis.[13] Racketeering acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (citation omitted). In making this determination, we employ the "commonsense, everyday understanding" of the statutory language. *Id.* at 241.

We conclude that the government sufficiently established a "pattern of racketeering activity." The government introduced evidence of twelve racketeering acts leading up to Quick's kidnapping and murder. Various combinations of DNGS members committed these crimes together. Those crimes shared the common purpose of enriching DNGS

---

[13] While the defendants have not, apart from a single conclusory statement, raised a continuity argument, we determine that the continuity prong is satisfied here. *H.J. Inc.*, 492 U.S. at 241–42 (holding that the continuity prong can be met by showing that related predicate offenses continued over a substantial period of time or posed a threat of continuing activity). Although the predicate acts established at trial were committed over the span of five months, the racketeering offenses were part of an ongoing criminal enterprise and were committed to enrich DNGS members and to facilitate future criminal acts. *See id.* at 242–43 (noting that "the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes"). DNGS also worked to protect its members from apprehension by law enforcement authorities. *See United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) (holding that "in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals . . . courts generally have concluded that the requisite threat of continuity was adequately established").

24

members, bolstering the gang's reputation for violence, or evading law enforcement authorities. In committing these crimes, the defendants employed firearms, threats of physical force, and actual physical force. The jury could conclude, based on this evidence, that the defendants had engaged in a "pattern of racketeering activity."

b.

Halisi and Stokes separately argue that the government failed to prove that either of them agreed to the commission of at least two of the charged racketeering acts. The government offered evidence of three categories of racketeering acts: drug trafficking, obstruction of justice, and robbery, in violation of state and federal law.[14] Although Halisi and Stokes do not dispute that they conspired to distribute narcotics, they argue that these activities were not related to DNGS and, thus, were not part of the RICO conspiracy. Halisi and Stokes also claim that their acts of obstruction did not constitute racketeering acts, because those acts occurred after the completion of the RICO conspiracy. We disagree with these arguments.

"[A] defendant can conspire to violate RICO and violate [Section] 1962(d) without himself committing or agreeing to commit the two or more acts of racketeering activity." *Mouzone*, 687 F.3d at 218 (internal brackets and quotation marks omitted) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)). He need only "agree to pursue the same criminal objective" as that of the enterprise. *Salinas*, 522 U.S. at 63–64. This agreement is apparent from Halisi and Stokes' role within DNGS. Both men were the enterprise's founders and leaders. Both defendants had a central role in directing the enterprise, which required its

---

[14] Because we conclude that Halisi and Stokes participated in the racketeering acts of drug trafficking and obstruction of justice, we need not decide whether there was sufficient evidence to prove that they also participated in the other racketeering activities alleged in the indictment, including robbery.

25

members to commit crimes for the gang's welfare and support. These facts strongly support the jury's conclusion that Halisi and Stokes were actively involved in the RICO conspiracy conducted by DNGS, including the robberies committed by the capital defendants and others.

Abundant evidence showed that DNGS members distributed controlled substances and discussed arrangements for expanding their drug distribution networks at DNGS meetings. Other evidence showed that drug trafficking was done for the benefit of DNGS, and copies of DNGS-related documents introduced at trial reflected a detailed code used by DNGS members to disguise their intended language when discussing narcotics. DNGS members also sought to invest money obtained from robberies and theft into the gang's drug distribution network. Thus, the jury could conclude from the evidence that the distribution of controlled substances was a centerpiece of the DNGS criminal enterprise.

The government also produced substantial evidence that the acts of obstruction committed by Halisi and Stokes were done during and in furtherance of the conspiracy. Halisi and Stokes ordered the destruction of, or directly destroyed, evidence related to Quick's murder, including Quick's ATM card, the murder weapon, and the phones belonging to DNGS members. Halisi and Stokes took these actions not only to "cover up" the crimes that had been committed, but also to prolong the unlawful activities of the DNGS enterprise and to protect the DNGS members from being arrested. Accordingly, the jury could conclude from this evidence that the obstructive acts committed by Halisi and Stokes constituted acts of racketeering. *Altomare*, 625 F.2d at 8 n.9 (explaining that defendant's attempt to obstruct was "not merely an attempt to cover up a previously completed crime,

26

but was an effort to prolong the unlawful activities of the enterprise in which he and his co-conspirators were engaged").

## 2.

The capital defendants argue that the evidence was insufficient to prove that they engaged in witness tampering by murder to prevent Quick from reporting a carjacking offense. In particular, they assert that their witness tampering convictions cannot stand, because the government failed to prove the underlying crime of carjacking. We find no merit in this argument.

The federal witness tampering statute prohibits "kill[ing] another person, with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States" of "information relating to the . . . *possible* commission of a Federal offense." 18 U.S.C. § 1512(a)(1)(C) (emphasis added). Section 1512 does not require that the government prove the completion of an underlying federal offense to establish witness tampering.[15] Instead, inclusion of the word "possible" in the statutory language reflects that a conviction under Section 1512 requires only that a witness was prevented from communicating to the authorities information about a *possible or actual* federal offense.

## 3.

---

[15] For the same reason, we reject the capital defendants' more specific argument that the government failed to adduce evidence establishing the federal nexus required by the carjacking statute. *See* 18 U.S.C. § 2119 (prohibiting the taking of "a motor vehicle that has been *transported, shipped, or received in interstate or foreign commerce*" (emphasis added)). For the purposes of the witness tampering conviction, the government was not required to proffer evidence proving the elements of the underlying crime of carjacking, including the federal nexus requirement.

Halisi and Stokes contend that the evidence was insufficient to support their convictions for obstruction of justice under 18 U.S.C. § 1512(c)(1), which, in relevant part, prohibits a person from "corruptly . . . alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding." We consider their separate arguments in turn.

Halisi argues that, because he only instructed other individuals to destroy evidence and did not directly destroy any evidence himself, he did not commit the crime of obstruction of justice.[16] We disagree.

Under the doctrines of vicarious liability and co-conspirator liability, a defendant is liable for the substantive offenses committed by a co-conspirator when the commission of the acts is reasonably foreseeable and is done in furtherance of the conspiracy. *United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010). The jury properly was instructed on both these theories of liability.[17] The evidence at trial established that Halisi ordered Casterlow to destroy Quick's ATM card, instructed his girlfriend to destroy his and Casterlow's phones, and gave Stokes the disassembled murder weapon in order for Stokes to discard the component parts. Thus, the jury reasonably could determine under a theory of either vicarious or co-conspirator liability that Halisi was responsible for destroying

---

[16] The indictment alleged that Halisi was involved "in directing the efforts of the enterprise in the destruction of documents and evidence associated with" Quick's murder.

[17] These theories of liability need not be charged in the indictment. *See Ashley*, 606 F.3d at 143.

28

evidence by commanding others to do so on his behalf. Accordingly, we affirm his conviction for obstruction of justice.

Stokes advances a separate challenge to his conviction for obstruction of justice. He argues that: (1) his conviction is invalid because a federal grand jury had not been convened to consider the crimes charged at the time that he purportedly obstructed justice; and (2) the government failed to prove that, at the time of his actions, he contemplated an official proceeding that was *federal* in nature. We reject both these arguments, which are foreclosed by the plain language of Section 1512.

Section 1512(f)(1) provides, in relevant part, that "[f]or the purposes of this section . . . an official proceeding need not be pending or about to be instituted at the time of the offense." And Section 1512(g)(1) provides that "[i]n a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance . . . that the official proceeding . . . is before a judge or court of the United States, a United States magistrate judge, . . . a Federal grand jury, or a Federal Government agency."

Despite this plain language, however, Stokes maintains that the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), clarified that the government was required to prove that Stokes contemplated a particular and foreseeable federal grand jury or federal court proceeding. The Supreme Court held in *Arthur Andersen* that certain other provisions of the witness tampering statute, Section 1512(b)(2)(A) and (B), require that the government prove a "nexus" between the defendant's conduct and a foreseeable official proceeding. 544 U.S. at 698, 707–08. We will assume, without deciding, that Section 1512(c)(1) imposed the same burden on the government in the

29

present case, requiring the government to establish a "nexus" between Stokes' obstructive action and a foreseeable official proceeding. *See United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019) (holding that the "nexus" requirement applies to Section 1512(c)(2)). The evidence before us easily satisfied such a requirement.

Rice, who was with Stokes days after Quick's murder, testified that Stokes received a call that "the fed—the police had kicked in the door to [the DNGS members' hotel]." Stokes responded to Rice that the murder weapon was still in Casterlow's possession, and that Stokes was "concerned" the gun could be traced "back to the murder" and link him to the crime. The evidence further established that Stokes later took action to dispose of the murder weapon. The jury could conclude from this evidence that Stokes thought that his acts likely would affect a foreseeable official proceeding. *See Arthur Anderson*, 544 U.S. at 707.

Nor was the government required to establish that Stokes contemplated an official proceeding that was federal in nature in order to secure a conviction under Section 1512(c). As quoted above, the language of Section 1512(g)(1) plainly refutes such a contention. *See United States v. Phillips*, 583 F.3d 1261, 1264–65 (10th Cir. 2009) (holding that in a prosecution under Section 1512(c), "the government need not prove [that] the defendant knew that the official proceeding at issue was a federal proceeding such as a grand jury investigation"). Accordingly, we conclude that the evidence was sufficient to support Stokes' conviction for obstruction of justice under Section 1512(c)(1).

F.

30

The defendants next challenge a number of their convictions under 18 U.S.C. § 924(c) for use of a firearm during a crime of violence. They argue that the predicate offenses underlying their Section 924(c) convictions do not qualify as crimes of violence under the statute's "force clause," 18 U.S.C. § 924(c)(3)(A). With respect to the statute's "residual clause," *id.* § 924(c)(3)(B), the defendants argue that the clause is unconstitutionally vague in light of the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015) (*Johnson II*).

We review de novo the question whether an offense qualifies as a crime of violence. *See United States v. McNeal*, 818 F.3d 141, 151 (4th Cir. 2016). An offense under Section 924(c) arises when a defendant uses or carries a firearm during or in relation to a "crime of violence." 18 U.S.C. § 924(c)(1)(A). Subsection (c)(3) defines the term "crime of violence" as a felony offense that:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). We refer to Section 924(c)(3)(A) as the "force clause," and to Section 924(c)(3)(B) as the "residual clause" or the "924(c) residual clause." *United States v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015).

The Supreme Court recently agreed with the defendants' argument that the 924(c) residual clause is unconstitutionally vague. *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019). The Court held that like similarly worded residual clauses struck down in *Johnson*

31

*II*, 135 S. Ct. at 2557, and *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018), the 924(c)

residual clause improperly required the sentencing judge's "estimation of the degree of risk

posed by a crime's imagined 'ordinary case.'" *Davis*, 139 S. Ct. at 2325-26, 2336.[18]  Our

analysis therefore is limited to considering whether the defendants' prior convictions qualify

as crimes of violence under the force clause.

To determine whether an offense qualifies as a crime of violence under Section

924(c)(3)(A), we apply the categorical approach or the modified categorical approach,

depending on the nature of the offense.  *Id.*  The categorical approach focuses "on the

*elements* of the prior offense rather than the *conduct* underlying the conviction."  *United*

*States v. Cabrera-Umanzor*, 728 F.3d 347, 350 (4th Cir. 2013) (citation omitted).  Thus,

we do not inquire "whether the defendant's conduct *could* support a conviction for a crime

of violence" but instead inquire "whether the defendant was *in fact convicted* of a crime

that qualifies as a crime of violence."  *Id.*

In a "narrow range of cases," involving statutes that are comprised of "multiple,

alternative versions of the crime," we apply the modified categorical approach.  *Descamps*

*v. United States*, 570 U.S. 254, 261–62 (2013) (citing *Taylor v. United States*, 495 U.S.

575, 602 (1990)).  When confronted with such a "divisible" statute, we review certain

underlying documents, including the indictment, "to determine what crime, with what

---

[18]  The Supreme Court rejected the government's argument that unlike the residual clauses at issue in *Johnson II* and *Dimaya*, the 924(c) residual clause permits a case-specific approach allowing consideration of the defendant's actual conduct in the predicate crime, rather than the crime in the "ordinary" sense.  *Davis*, 139 S. Ct. at 2327−33.  The Court reasoned that the statutory language and historical context of the 924(c) residual clause did not permit a "case-specific reading."  *Id.*

elements," formed the basis of a defendant's conviction. *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (citations omitted).

With this framework in mind, we turn to consider each predicate offense underlying the defendants' Section 924(c) convictions. These predicate offenses are: (1) VICAR in violation of 18 U.S.C. § 1959 by committing murder in violation of Virginia law, Virginia Code § 18.2-32; (2) witness tampering by means of murder in violation of 18 U.S.C. § 1512(a); (3) Hobbs Act robbery in violation of 18 U.S.C. § 1951(a); and (4) VICAR by committing kidnapping in violation of Virginia law, Virginia Code § 18.2-47.

1.

We begin by addressing whether the capital defendants' Section 924(c) convictions, which involve (1) commission of VICAR by committing first-degree murder under Virginia law[19] and (2) federal witness tampering by means of murder under federal law, qualify as crimes of violence under the force clause. The capital defendants contend that Virginia's definition of first-degree murder,[20] prohibited under Virginia Code § 18.2-32, does not require the use or threatened use of force against another, because a defendant can violate the statute by using non-violent, indirect means, such as "poison[ing]" a victim.

---

[19] Neither party contests the applicability of the categorical approach to the VICAR-murder, agreeing that Virginia's murder statute is indivisible.

[20] Virginia Code § 18.2-32 specifies "[a]ll murder other than capital murder and murder in the first degree is murder of the second degree." Although the indictment did not specify whether the VICAR conviction was predicated on a first-degree or second-degree murder, the district court instructed the jury on first-degree murder. The parties do not dispute that the capital defendants' VICAR convictions stem from commission of first-degree murder under Virginia law.

33

Advancing the same rationale, the capital defendants also assert that federal witness tampering by murder, under 18 U.S.C. § 1512(a)(1)(C), is not categorically a crime of violence.

This line of reasoning, however, is foreclosed by the Supreme Court's decision in *United States v. Castleman*, in which the Court held that "physical force is simply force exerted by and through" human action and that, therefore, a person need not "directly" touch his victim to exert "physical force." 572 U.S. 157, 170−71 (2014) (citations and internal quotation marks omitted). Accordingly, so long as an offender's use of physical force, whether direct or indirect, could cause a violent result, the force used categorically is violent. *See id.* at 1415; *see also In re Irby*, 858 F.3d 231, 236, 238 (4th Cir. 2017) (holding that second-degree retaliatory murder is a crime of violence under Section 924(c)'s force clause and noting that the "distinction . . . between indirect and direct applications of force . . . no longer remains valid in light of *Castleman*'s explicit rejection of such a distinction") (citations and internal quotation marks omitted).

A conviction for first-degree murder under Virginia law requires the "willful, deliberate, and premeditated" killing of another. Va. Code § 18.2-32. Murder "requires the use of force capable of causing physical pain or injury to another person" irrespective whether that force is exerted directly or indirectly by a defendant. *See In re Irby*, 858 F.3d at 236, 238. Therefore, we conclude that the crime of first-degree murder under Virginia law qualifies categorically as a crime of violence under the force clause, and we affirm the capital defendants' Section 924(c) convictions that are based on the commission of this Virginia offense.

34

Likewise, because federal witness tampering by murder also requires the unlawful killing of another, which may be accomplished by force exerted either directly or indirectly, we find no merit in the capital defendants' challenge to their federal witness tampering convictions under 18 U.S.C. § 1512(a)(1)(C).[21] *See In re Irby*, 858 F.3d at 236. Accordingly, we affirm the Section 924(c) convictions predicated on the capital defendants' convictions for federal witness tampering by murder, in violation of Section 1512(a)(1)(C).

2.

We next consider the defendants' argument that their Section 924(c) convictions based on Hobbs Act robbery do not qualify as crimes of violence.[22] The defendants argue that because Hobbs Act robbery can be committed by placing a victim in fear of injury, the offense does not necessarily include as an element the "use, attempted use, or threatened

---

[21] Because this offense can be committed in various ways, the statute is divisible. *See Descamps*, 570 U.S. at 262. However, we need not apply the modified categorical approach here, because the parties agree and the record establishes that the capital defendants were convicted of witness tampering by means of murder under Section 1512(a)(1)(C). *See United States v. Carthorne*, 726 F.3d 503, 512 (4th Cir. 2013).

[22] The defendants convicted of Hobbs Act robbery and the related Section 924(c) charge are Shantai, Mersadies, and Mathis.

use of force," as required by the force clause. The defendants also contend that because Hobbs Act robbery may be accomplished by threatening another with injury to *intangible* property, such as shares of stock in a corporation, Hobbs Act robbery does not qualify as a crime of violence under the force clause. We disagree with both arguments.[23]

The Hobbs Act penalizes a person who "in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951. "Robbery" is defined, in relevant part, as the taking of personal property from another "by means of actual or threatened force, or violence, or *fear of injury*, immediate or future, to his person or property." *Id.* § 1951(b)(1) (emphasis added).

The question whether Hobbs Act robbery, when committed by means of causing fear of injury, qualifies as a crime of violence is guided by our decision in *McNeal*, 818 F.3d 141. In *McNeal*, we held that the crime of federal bank robbery, which may be committed by "force and violence, or by *intimidation*," 18 U.S.C. § 2113(a) (emphasis added), qualifies as a crime of violence under the force clause. 818 F.3d at 152–53. We explained that the use of intimidation, as proscribed by the bank robbery statute, necessarily "involves the threat to use [physical] force." *Id.* at 153. Although the bank robbery statute,

---

[23] The Hobbs Act is a divisible statute that prescribes two alternative methods of violating the Hobbs Act, namely, robbery and extortion. 18 U.S.C. § 1952(b)(1), (2). As before, however, we need not apply the modified categorical approach here, because the parties do not dispute and the record supports that the defendants were charged with and convicted of Hobbs Act robbery. *See Carthorne*, 726 F.3d at 512.

Section 2113, refers to use of "intimidation," rather than "fear of injury," we see no material difference between the two terms for purposes of determining whether a particular type of robbery qualifies as a crime of violence. Nor are we aware of any case in which a court has interpreted the phrase "fear of injury" as meaning anything other than intimidation.

We also observe that both Section 924(c) and Hobbs Act robbery reference the use of force or threatened use of force against "property" generally, without further defining the term "property." *Compare* 18 U.S.C. § 924(c)(3)(A) (defining a "crime of violence" as having "as an element the use, attempted use, or threatened use of physical force against . . . property of another"), *with* 18 U.S.C. § 1951 (defining "robbery" as a taking "by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his . . . property"). And neither provision draws any distinction between tangible and intangible property. Thus, we do not discern any basis in the text of either statutory provision for creating a distinction between threats of injury to tangible and intangible property for purposes of defining a crime of violence. Accordingly, we conclude that Hobbs Act robbery constitutes a crime of violence under the force clause of Section 924(c).[24] *See United States v. Garcia-Ortiz*, 904 F.3d 102, 109 (1st Cir. 2018); *United States v. Hill*, 890

---

[24] The defendants offer two additional arguments in support of their contention that Hobbs Act robbery is not a crime of violence. The defendants first assert that a threat of injury does not require the threat of violent force, such as when a perpetrator threatens another's property by throwing paint on someone's house. The defendants also assert that because Hobbs Act robbery is akin to common law robbery, Hobbs Act robbery does not contain the required force element. After reviewing these arguments, we conclude that neither has merit.

F.3d 51, 60 (2d Cir. 2018); *United States v. Rivera*, 847 F.3d 847, 849 (7th Cir. 2017); *In re Fleur*, 824 F.3d 1337, 1340–41 (11th Cir. 2016).

3.

Finally, the capital defendants challenge their Section 924(c) convictions predicated on their VICAR convictions for kidnapping under Virginia law. They argue that because kidnapping under Virginia law can be committed by deception, the offense is not categorically a crime of violence under the force clause. *See* Va. Code § 18.2-47(A).[25] We agree.

Virginia's kidnapping statute generally prohibits an individual from seizing or taking another person "by force, intimidation, or deception" with the intent to deprive that person of his or her liberty. Va. Code § 18.2-47(A). Although the statute describes various ways that an individual may commit the act of kidnapping, namely, by force, intimidation, or deception, these alternatives represent various means of committing the crime, not alternative elements of the crime. *See Fuertes*, 805 F.3d at 498 ("[A]lthough § 1591(a) refers to alternative *means* of commission, it contains a single, indivisible set of *elements*, and the categorical approach applies."). Accordingly, we conclude that Virginia Code § 18.2-47(A) is indivisible, requiring application of the categorical approach. *See id.*

---

[25] The capital defendants also assert that kidnapping under Virginia law does not qualify as a crime of violence under the 924(c) residual clause, because that clause is unconstitutional in light of the Supreme Court's holding in *Johnson II*, 135 S. Ct. 2551. As we explained above, the Supreme Court recently has concluded that the 924(c) residual clause is unconstitutionally vague. *Davis*, 139 S. Ct. at 2336. Accordingly, our determination explained below, that kidnapping under Virginia law does not qualify as a crime of violence offense under the force clause, is dispositive.

A review of the statute's language and the decisions by Virginia's appellate courts interpreting that language indicates that the offense may be committed in a non-violent manner through deceptive means.[26] Va. Code § 18.2-47; *Jerman v. Dir. of the Dep't of Corrs.*, 593 S.E.2d 255, 259 (Va. 2004) (affirming a kidnapping conviction when the evidence proved that one of the defendant's confederates convinced the victim to come with her under the ruse of selling illegal narcotics when the defendant's true intent was to harm the victim); *Kent v. Commonwealth*, 183 S.E. 177, 177–78 (Va. 1936) (affirming a conviction for kidnapping committed by fraud and coercion and without the use of force or restraint). Because Virginia defines kidnapping in a manner that allows for both violent and nonviolent means of committing the offense, the statute "sweep[s] more broadly" than the force clause's requirement that the offense be committed with the use, or attempted or threatened use, of physical force. *See Descamps*, 570 U.S. at 261; 18 U.S.C. § 924(c)(3)(A). Thus, we conclude that kidnapping under Virginia law does not qualify categorically as a crime of violence under the force clause. We therefore vacate the capital defendants' Section 924(c) convictions stemming from the commission of VICAR based on kidnapping under Virginia law.

G.

---

[26] To determine if a state conviction qualifies as a crime of violence, we look to the language of the statute as well as decisions by the state's courts. *See United States v. Doctor*, 842 F.3d 306, 312 (4th Cir. 2016).

Finally, the capital defendants argue that the fines imposed on each of them should be vacated as substantively unreasonable.[27] We disagree.

We review the substantive reasonableness of any part of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). After considering the factors outlined in Sentencing Guidelines Section 5E1.2(d) and concluding that a fine was warranted, the district court imposed on each defendant a $5,000 fine, a sum well below the advisory guidelines range.[28] *See* U.S.S.G. § 5E1.2. The defendants have not offered any evidence rebutting the presumption of reasonableness that we apply to the district court's below-Guidelines imposition of fines. *United States v. Perez-Jiminez*, 654 F.3d 1136, 1146–47 (10th Cir. 2011). Therefore, we hold that the court did not abuse its discretion in imposing those fines in this case.

III.

For these reasons, we affirm in part the district court's judgment, vacate the capital defendants' Section 924(c) convictions predicated on their VICAR convictions for kidnapping under Virginia law, and remand for resentencing of those capital defendants, namely, Mathis, Shantai, Mersadies, and Kweli.

---

[27] The defendants do not challenge the assessment of their fines as procedurally unreasonable.

[28] Kweli is the only capital defendant whose sentencing transcript was included in the record before this Court. Because the defendants have not raised an objection to the completeness of the record, our analysis of the substantive reasonableness of the fines assessed against each defendant stems from our review of Kweli's sentencing transcript only.

40

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED