**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4242**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

ZACKARY ELLIS SANDERS,

        Defendant – Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis III, Senior District Judge.  (1:20-cr-00143-TSE-1)

---

Argued:  March 22, 2024                         Decided:  July 9, 2024

---

Before NIEMEYER, KING and BENJAMIN, Circuit Judges.

---

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Niemeyer and Judge Benjamin joined.

---

**ARGUED:**  Lawrence Robbins, FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP, New York, New York, for Appellant.  Joseph Attias, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:** Brandon L. Arnold, Leslie C. Esbrook, KRAMER LEVIN ROBBINS RUSSELL, Washington, D.C., for Appellant.  Jessica D. Aber, United States Attorney, Aidan Taft Grano-Mickelsen, Assistant United States Attorney, Richmond, Virginia, William G. Clayman, Special Assistant United States Attorney, Jay V. Prabhu, Assistant United States

Attorney, Seth M. Schlessinger, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————

KING, Circuit Judge:

Following a jury trial in October 2021 in the Eastern District of Virginia, defendant Zackary Ellis Sanders was convicted of five offenses involving the illegal production of child pornography, six offenses involving the illegal receipt of child pornography, and a single offense for illegal possession of child pornography. The district court sentenced Sanders to 216 months in prison. Sanders now pursues a multifaceted appeal, maintaining that the court committed reversible error at nearly every stage of the underlying proceedings.

Sanders's appellate contentions broadly manifest in four different forms — first, that the district court erred in denying motions to suppress evidence seized pursuant to a search warrant for his residence, plus Sanders's related efforts to inquire into alleged misrepresentations in the affidavit supporting the issuance of that warrant; second, that the court erred in admitting statements Sanders made to FBI agents during the search of his residence; third, that the court improperly excluded purported evidence of the victims' voluntary participation in the production of child pornography, including expert testimony about a so-called "BDSM culture;"[1] and, fourth, that the court erred in giving three types of challenged jury instructions.

---

[1] The acronym "BDSM" relates to the conduct of Sanders and the minor victims, and has been used by the lawyers throughout the district court proceedings and in the briefs, allegedly standing for bondage, discipline, dominance, submission, sadism, and masochism.

3

As explained herein, we reject each of Sanders's appellate contentions and affirm the judgment of the district court.

## I.

Before reviewing the procedural history and assessing the legal issues presented, we will summarize the pertinent facts. The facts and reasonable inferences drawn therefrom are recited in the light most favorable to the Government, as the prevailing party at trial and in the suppression proceedings. *See United States v. Burgos*, 94 F.3d 849, 854 (4th Cir. 1996) (regarding jury verdict); *United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004) (regarding suppression hearing).

## A.

### 1.

In August 2019, a law enforcement agency in another country (the "Foreign Agency") provided an intelligence report to the FBI, advising that a specific Internet Protocol address (an "IP address") had accessed "child sexual abuse and exploitation material."[2] *See* J.A. 1406.[3] The report of the Foreign Agency further advised that this particular IP address, on May 23, 2019, at approximately 10:00 PM EST:

---

[2] An IP address is a unique numerical figure that identifies an electronic device accessing the Internet, and it is used to route information between Internet-connected devices.

[3] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

> [W]as used to access online child sexual abuse and exploitation material, with an explicit focus on the facilitation of sharing child abuse material (images, links and videos), emphasis on BDSM, hurtcore, gore, and death-related material including that of children. Users were required to create an account (username and password) in order to access the majority of the material.

*Id.* (the "August Report").[4]

A month later, in September 2019, the FBI received a second report from the Foreign Agency. This submission represented to the FBI that the information provided in the August Report was "lawfully obtained" pursuant to a warrant. *See* J.A. 1408. Additionally, it advised that "at no time was any computer or device interfered with in the United States," and that the Foreign Agency "did not access, search or seize any data from any computer in the United States." *Id.*

Soon thereafter, the Foreign Agency named and described the website that the subject IP address had used to access the child pornography — entitled "Hurt Meh." The Hurt Meh website is a so-called "TOR hidden service." The term "TOR" is a reference to the TOR network — a unique network that routes an Internet user's communications over the Internet through a randomly assigned path of relay computers. The purpose of the TOR network is to mask the IP address of the Internet user.

If an Internet user wishes to access the TOR network, he must use the "TOR browser" — which can be obtained for free by downloading it from the private entity that

---

[4] The website at issue defines "hurtcore" as "rape, fighting, wrestling, bondage, spanking, pain, mutilation, gore, dead bodies, and etc., (no limits)." *See* J.A. 1445. The term "hurtcore" is thus a reference to violent pornography. *Id.* at 1444.

maintains the TOR network. When using the TOR browser, an Internet user can access "open" Internet websites — such as google.com or wikipedia.org. The TOR browser, however, makes it possible for users to access websites that are accessible only to users operating within the TOR network. These TOR-based websites are called "hidden services." *See* J.A. 1443. And, as identified above, Hurt Meh was one of these hidden services.

There are additional differences between TOR-based hidden services and open websites. The website addresses of a TOR hidden service are comprised of a string of randomly generated characters followed by an ".onion" suffix. The nature of hidden TOR-based services means that they are "much more difficult" to locate through a typical Internet search, as compared to an open Internet website. *See* J.A. 1448. Usually, to locate a specific hidden service, a TOR user would have to access a TOR directory — which is also a TOR hidden service — that would identify and advertise the web addresses for multiple other hidden services. These combined features create anonymity and obscurity, making TOR hidden services, the TOR browser, and the TOR network, very appealing vehicles for criminal activity. They have particularly been a boon for the online sexual exploitation of children.

Hurt Meh is one such website. It is an online bulletin board, dedicated to the advertisement and distribution of child pornography, and it was operational from July 2016

6

until June 2019.[5]  The homepage for the Hurt Meh website contained a search bar and various links, including a link titled "Announcements."  *See* J.A. 1777.  If a TOR user clicked on the "Announcements" link, a message called "Welcome, Please read before registering" would be visible.  *Id.* at 1444.  The content of the message provided:

> Welcome abusers and abusees and those that enjoy watching.  This website was created to host videos, photos and discussions of 18 (twinks) and younger of Hurtcore materials (videos & pictures) as well as discussion of such. . . . PS Please register to see all the forums, and use strong password for user profile.

*Id.*  No pornographic material was displayed on Hurt Meh's homepage.  To access such material, the TOR user had to create a username and password.

The FBI was well aware of the above-described nature of Hurt Meh and TOR when it received the initial reports from the Foreign Agency.  Notably, the FBI and other domestic law enforcement agencies had a longstanding relationship with the Foreign Agency and had developed a regular and mutually beneficial practice of sharing reliable investigative information concerning TOR users who appear to be engaged in online sexual exploitation.  *See* J.A. 1448.

2.

Based on the foregoing, the FBI opened an investigation into the IP address identified in the August Report.  The IP address was associated with an 11,000-square-foot mansion in McLean, Virginia, where the then 24-year-old defendant Zackary Sanders was

---

[5] Hurt Meh's operation ceased in June 2019, when an unidentified foreign law enforcement agency located and seized the computer server that was hosting the website.

7

known to reside with his parents. As part of the investigation, FBI Special Agent Ford prepared a 36-page affidavit (the "Affidavit"), summarizing not only the FBI's investigation, but also, inter alia, the nature of Hurt Meh, the TOR network, and the various reports received from the Foreign Agency. Of relevance to Sanders's appellate contentions today are the Affidavit's ¶¶ 23 and 25, which specify information contained in the Foreign Agency's shared reports and domestic law enforcement's relationship with the Foreign Agency. Those two paragraphs of Agent Ford's Affidavit relate, in relevant part:

> 23. In August 2019, [the Foreign Agency] . . . notified the FBI that the [Foreign Agency] determined that on May 23, 2019, a user of IP address [omitted] accessed online child sexual abuse and exploitation material via a website that the [Foreign Agency] named and described as [Hurt Meh].

> 25. The [Foreign Agency] . . . advised U.S. law enforcement that it obtained that information through independent investigation that was lawfully authorized in the [Foreign Agency]'s country pursuant to its national laws. The [Foreign Agency] further advised U.S. law enforcement that the [Foreign Agency] had not interfered with, accessed, searched, or seized any data from any computer in the United States in order to obtain that IP address information.

See J.A. 1447-48.

The Affidavit also describes pertinent characteristics of individuals who access child pornography on the Internet. Such persons, according to the Affidavit, may electronically possess, collect, and maintain such materials. Those materials are stored electronically, thereby making evidence of such activity, including even deleted child pornography, recoverable on those individuals' computers for a long period.

On February 10, 2020 — approximately nine months after the target IP address had accessed the Hurt Meh website — the FBI submitted Agent Ford's Affidavit to the district

8

court in Eastern Virginia, and requested a search warrant for the identified residence in McLean, Virginia, in addition to any structure or person on the property. The search warrant was issued that same day by a federal magistrate judge in Alexandria (the "February Warrant").

3.

Two days after the February Warrant was issued, in the early morning hours of February 12, 2020, the FBI executed it. When the FBI agents arrived at the residence, Sanders's father admitted them. Sanders was located and then taken to an office therein to be interviewed. Once situated in the office, the FBI agents explained to Sanders that he was not under arrest and that it was his choice as to whether to speak to the agents. Sanders agreed to be interviewed and understood that the interview was being recorded. Sanders did not receive any *Miranda* warnings.

The FBI interview of Sanders lasted approximately three hours, and during the interview other FBI agents searched the residence. That search uncovered multiple electronic devices in Sanders's bedroom, including a flash drive containing child pornography.[6] When the interviewing FBI agents began asking about the flash drive, Sanders asked if he could speak with his mother. The agents promptly brought his mother into the room. After speaking with his mother for about 15 minutes, the FBI interview of Sanders resumed. Sanders acknowledged that he recognized the flash drive. He explained

---

[6] A flash drive is a small and portable electronic device, which is commonly used for storing electronic data transferred from a computer or digital device.

9

that he had transferred the child pornography to the flash drive himself and that he had accessed the material by using the TOR browser and a TOR directory. Approximately two hours later, the search and the interview concluded, and the FBI left without making any arrests.

4.

The electronic devices that were seized by the FBI from Sanders's residence on February 12, 2020, were subjected to extensive forensic examination. That examination uncovered several messages that Sanders had sent to six different boys — aged 13 to 17 — through a mobile messaging application. In his conversations with five of those minor children, Sanders instructed them to record and send videos and pictures that depicted themselves nude. Sanders would frequently tell the minors to verbally degrade themselves with insults while recording the videos. Four of the minors were instructed to "slap" their genitals "as hard as [they] can," record themselves doing so, and send the video to Sanders. *See, e.g.*, J.A. 71. Sanders told two of the minors to record themselves masturbating. One boy sent a video to Sanders, depicting the minor engaged in oral sex. Additionally, the FBI found multiple videos of child sexual abuse on Sanders's electronic devices. These videos include depictions of infants and minors being sexually abused, including being orally and anally raped by adult men.

B.

On June 24, 2020, an Indictment was returned in the Eastern District of Virginia naming Sanders as the sole defendant. The Indictment alleged twelve offenses:

10

- Five counts alleging production of child pornography in violation of 18 U.S.C. § 2251(a) (the "Production Charges");

- Six counts alleging receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) (the "Receipt Charges"); and

- One count alleging possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (the "Possession Charge").

*See* J.A. 86.  The district court's deadline for pre-trial motions was initially set for August 20, 2020, but was extended to August 27.

1.

In July 2020, Sanders sought to compel the Government to produce discovery related to the Affidavit, pursuant to Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure.[7]  Sanders asserted that he was entitled to such discovery because Agent Ford had misled the magistrate judge by (1) misrepresenting the content of the Foreign Agency's reports, and (2) swearing that the Foreign Agency, in generating the August Report, did not interfere with a computer in the United States, when Agent Ford knew or should have known that the contrary was true.  Sanders wanted to probe these alleged

---

[7] The relevant portion of Rule 16(a)(1)(E) provides as follows:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . *the item is material to preparing the defense*.

Fed. R. Crim. P. 16(a)(1)(E) (emphasis added).

11

misrepresentations to bolster his planned pretrial attack on the validity of the February Warrant.

On August 21, 2020, the district court denied Sanders's motion to compel for failure to satisfy the materiality requirement of Rule 16(a)(1)(E). As explained in more detail below, the court ruled Sanders had not presented sufficient facts to indicate that the discovery would have actually helped prove his defense.[8]

2.

On August 27, 2020 — the day of the district court's pretrial motion deadline — Sanders filed a motion to suppress, seeking the suppression of the fruits of the search and a *Franks* hearing.[9] The motion — after first being struck for exceeding the 30-page limit under the pertinent local rule — was later refiled as four separate motions to suppress. Those four suppression motions raised slightly varied arguments that (1) there was a lack of probable cause to support the issuance of the February Warrant, and (2) Agent Ford had intentionally misled the magistrate judge in the supporting Affidavit.

The district court, in an October 26, 2020, Sealed Memorandum Opinion, rejected all of Sanders's suppression efforts (the "Suppression Opinion"). The court began its

---

[8] When Sanders subsequently renewed his motion to compel — which occurred multiple times throughout the proceedings — the district court denied those efforts as well. *See* J.A. 400, 1650, 1833-35, 4035.

[9] The term "*Franks* hearing" is a reference to a hearing conducted by a trial court pursuant to the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978). The purpose of a *Franks* hearing is to probe the truthfulness of an affidavit used to support a search warrant.

ruling by determining that the February Warrant was facially valid. From there, the court ruled that Sanders was not otherwise entitled to a *Franks* hearing because he had "failed to make a substantial preliminary showing that [Agent Ford] made a false statement knowingly and intentionally, or with reckless disregard for the truth that is necessary to find probable cause." *See* J.A. 1677.[10]

3.

On December 17, 2020 — 112 days after the district court's extended pre-trial motion deadline and 52 days after his four separate motions to suppress had been denied — Sanders filed an untimely fifth motion to suppress. In this fifth suppression motion, Sanders argued that his interview with the FBI agents on February 12, 2020, had been involuntary, and was in violation of the Fifth Amendment. The court ordered Sanders to show cause for his substantial delay in asserting that issue. In January 2021, the court ruled that Sanders had failed to show good cause for his tardiness and denied the fifth motion to suppress as untimely. *See* J.A. 288.[11]

C.

The prosecution of Sanders proceeded to a jury trial in October 2021, and it lasted seven days. During the trial, the Government called nine witnesses — including two of

---

[10] The district court denied Sanders's multiple subsequent attacks on the validity of the February Warrant. *See* J.A. 514, 2665, 4037.

[11] The district court also rejected Sanders's subsequent requests for reconsideration and renewed motions to suppress his interview statements on Fifth Amendment grounds. *See* J.A. 361, 410.

13

the minor victims — and admitted more than 175 exhibits. Sanders presented a relatively brief defense, which included Sanders testifying on his own behalf. On appeal, Sanders challenges several of the court's evidentiary rulings and three of the jury instructions. The procedural history of those challenges is discussed below.

1.

a.

During the pretrial proceedings, the Government moved *in limine* to exclude evidence relating to the minor victims' purported voluntary participation in their conduct with Sanders. The district court granted the motion and excluded such voluntary participation evidence, ruling that the alleged minor victims' state of mind was irrelevant and inadmissible. *See* J.A. 2469.

This *in limine* ruling was reinforced at several points by the district court in the trial. *See, e.g.*, J.A. 2830-32 (precluding Sanders from using screenshots of minor victim's online dating profile on BDSM-themed dating application to establish that minor victim was "into" BDSM), 3286 (excluding portions of chat transcripts that were offered to establish allegedly consensual nature of relationship between Sanders and minor victim). In these later rulings, the court expanded its reasoning to exclude evidence of the victims' purported voluntary participation under Rule 403 of the Federal Rules of Evidence, ruling that such evidence could confuse the jury on the issue of consent.[12] *Id.* at 3286, 3609.

---

[12] Rule 403 allows for the exclusion in limited circumstances of otherwise relevant evidence. It provides as follows:

(Continued)

14

b.

The district court also excluded the defendant's proposed expert testimony of Dr. Fredrick Berlin, a professor in the Department of Psychiatry and Behavioral Sciences at the Johns Hopkins University School of Medicine. Sanders designated Dr. Berlin as an expert to testify about the so-called BDSM culture, including how it "can also involve more than just sex" and that "such relationships are based upon mutual consent." *See* J.A. 2701. Dr. Berlin was prepared to testify that Sanders's ordering of the minor children to take photographs or videos of themselves was consistent with a consensual BDSM relationship. Additionally, Dr. Berlin would have testified on the meaning of certain terms frequently used in the BDSM culture, including "sub, dom, master, slave, owner, sir, boy, blackmail, bitch, pup, and collaring." *Id.* at 2700.

The district court excluded Dr. Berlin's purported expert testimony from the trial as irrelevant. The court again ruled that evidence of consent was irrelevant to Sanders's charges, and thus Dr. Berlin's testimony as to the purported consensual and non-sexual nature of BDSM relationships was excluded. The court also ruled that an expert was not needed to define certain BDSM terms, as their meanings "are not so different from their common meaning as to require expert explanation." *See* J.A. 2758.

---

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, *confusing the issues*, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

*See* Fed. R. Evid. 403 (emphasis added).

15

Even if Dr. Berlin's testimony was somehow relevant, the court ruled, it was nevertheless excludable under Rule 403 because the slight probative value of such testimony "would mislead the jury into thinking that the consent of alleged minor victims in this case . . . is somehow exculpatory." *See* J.A. 2760. The court also found that Dr. Berlin's testimony would be duplicative and unnecessary, because Sanders had already testified on his behalf and had explained various terms used in BDSM culture.

2.

The district court, throughout the trial, gave instructions to the jury regarding the Production Charges, the Receipt Charges, and the Possession Charge, alleged as violations of 18 U.S.C. § 2251(a), § 2252(a)(2), and § 2252(a)(4)(B), respectively. Before assessing those instructions, some background on the pertinent statutory language on the charged offenses is in order.

First, Section § 2251(a) of Title 18 — which sets forth the offense of production of child pornography — provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished as provided under [this section].

*See* 18 U.S.C. § 2251(a). The offense of receipt of child pornography is defined in 18 U.S.C. § 2252(a)(2), which provides:

> Any person who . . . knowingly receives, or distributes, any visual depiction using any means or facility of interstate or foreign commerce . . . if — (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (B) such visual depiction is of such conduct; . . . shall be punished as provided in . . . this section.

16

*See* 18 U.S.C. § 2252(a)(2).  Similarly, 18 U.S.C. § 2252(a)(4)(B), which outlines the

offense of possession of child pornography, provides:

> Any person who knowingly possesses . . . 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been . . . shipped or transported using any means or facility of interstate or foreign commerce . . . if — (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (ii) such visual depiction is of such conduct; shall be punished as provided in . . . this section.

*See* 18 U.S.C. § 2252(a)(4)(B).  With the foregoing statutory language in mind, we turn to

the district court's instructions.

a.

During Sanders's trial, the district court repeatedly instructed the jury that the

consent of the minor victims was irrelevant to each of the charged offenses.  The first

instruction came during the testimony of the first witness — one of the minor victims

Sanders had communicated with — and it was provided to the jury in response to a line of

questioning pursued on cross-examination by Sanders's lawyers.  The instruction was, in

relevant part:

> A minor cannot consent to sexual activity or to engaging in child sexual abuse.  So whether or not he wanted to do it or didn't want to do it is irrelevant.

*See* J.A. 2861.  The court repeated substantially similar instructions at other appropriate

times during the trial.  *Id.* at 3317 (during defense's cross-examination of Agent Ford),

3789-91 (during defense's closing argument).

During the charge conference — after the evidence was completely presented and

prior to the arguments of counsel — the district court informed the parties that it would

17

instruct the jury "that a minor cannot consent to the production of child pornography . . . [and] any argument regarding a minor's consent to the production of child pornography is irrelevant in reaching your verdict." *See* J.A. 577. Sanders objected to this instruction, requesting to add thereto that the jury could "consider the assent or voluntariness of the minor in determining the defendant's intent and purpose." *Id.* at 3731-32. In line with its prior rulings, the court rejected that request and charged the jury as it had proposed. Thus, each of the related instructions (collectively, the "Consent Instructions") consistently advised the jury that the consent or voluntary participation of minor victims in the alleged offenses is irrelevant.

b.

The production of child pornography in violation of 18 U.S.C. § 2251(a) requires that a person have a minor engage in sexually explicit conduct for "the purpose of producing any visual depiction of such conduct." Throughout the trial, Sanders argued that this statutory language required that such production had to be the predominant purpose of the defendant. *See* J.A. 474 (proposed jury instruction), 529-32 (midtrial written objection), 2771-72 (oral argument on second day of trial), 3263-72 (oral argument on fourth day of trial). In each instance, the trial court rejected Sanders's contention in that regard. *Id.* at 2772 ("I've ruled. . . . [I]t's not going to be dominant."), 3263 ("It has to be

18

a motivating purpose. It doesn't have to be predominant.").[13]  And on the fourth day of

trial, the court gave two midtrial jury instructions that production of each visual depiction

need be only "a motivating purpose." *See* J.A. 3225, 3272-75.

When the district court explained and gave its proposed instructions at the charge

conference, it again used the "motivating purpose" language — and this time Sanders did

not object. When the court charged the jury, it gave, in relevant part, the following

instruction:

> In deciding whether the Government has proven that the defendant acted for
> the purpose of producing a visual depiction of sexually explicit conduct, you
> may consider all of the evidence concerning the defendant's conduct. The
> production of a visual depiction of sexually explicit conduct must have been
> a significant or motivating purpose of the defendant, and not merely
> incidental to engaging in the sexually explicit conduct.
>
> It is not necessary, however, for the Government to prove that the defendant
> was single-minded in his purpose or that the production of a visual depiction
> of sexually explicit conduct was the defendant's sole or primary purpose.
> Rather, it is sufficient for the Government to prove that the defendant had a
> significant or motivating purpose of producing a visual depiction of sexually
> explicit conduct when he employed or used or persuaded or induced or
> enticed or coerced [a minor] to engage in sexually explicit conduct.

---

[13] There is no doubt that the district court considered and rejected Sanders's "predominant" purpose contention. When it denied Sanders's Rule 29 motion after the government's submission of evidence was completed, the court stated:

> Now, I know that the defendants also argue that I'm not construing the statute
> properly, that it ought to be the . . . predominant or sole purpose. Well, I've
> rejected that. And if I'm wrong the Court of Appeals will tell me, and the
> Court of Appeals would have to instruct me to vacate the convictions on
> those five counts that that pertains to.

*See* J.A. 3518-19.

19

*See* J.A. 573 (the "Purpose Instruction").

c.

Each of the twelve counts of the Indictment required the Government to prove that the visual depictions were of children engaging in "sexually explicit conduct." *See* 18 U.S.C. §§ 2251(a), 2252(a)(2), 2252(a)(4)(B). And § 2256(2)(A)(v) of Title 18 specifically defines "sexually explicit conduct" to include, in relevant part, "lascivious exhibition of the anus, genitals, or pubic area of any person." *See* 18 U.S.C. § 2256(2)(A)(v).

The district court, to provide the jury with guidance on what constitutes a "lascivious exhibition," informed the parties during the charge conference that it intended to give the jury a non-exhaustive multi-factor test, as spelled out by a 1986 federal trial court in California in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986) (the "*Dost* Factors*"). Sanders objected to the *Dost* Factors and countered that lascivious exhibition of the genitals "means depictions showing a minor engaged in . . . hard core sexual conduct." *See* J.A. 3740. Sanders's contention was rejected, and the court gave the following instruction on lascivious exhibition:

> For the visual depiction of an exhibition of the genitals or pubic area of a minor to be considered sexually explicit conduct, the exhibition must be lascivious. Whether a picture or image of the genitals or pubic area constitutes such lascivious exhibition requires a consideration of the overall context of the material. In determining whether an exhibition of the genitals or pubic area of a minor is lascivious, you may consider the following factors:
>
> Whether the focal point of the visual depiction is on the minor's genitals or pubic area; two, whether the setting or visual depiction is sexually suggestive — that is, a place or pose generally associated with sexual activity; whether the minor is depicted in an unnatural pose or in inappropriate attire

20

considering the age of the minor; whether the minor is fully or partially clothed or nude; whether the visual depiction suggests coitus or a willingness to engage in sexual activity; and whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

. . . [A] picture or image need not involve all of these factors to be lascivious exhibition of the genitals or pubic area. It is for you to decide the weight or lack of weight to be given to any of these factors. Ultimately, you must determine whether the visual depiction is lascivious based on its overall content.

*See* J.A. 584-85 (the "Lascivious Instruction").

\* \* \*

After the lawyers argued their positions to the jury, the district court gave its instructions. The jury deliberated for approximately two hours and returned its verdict of guilty on all twelve counts. On April 1, 2022, the district court sentenced Sanders to 216 months in prison on each of Counts 1 to 11, to run concurrently, plus 120 months on Count 12, to also run concurrently with the sentences on Counts 1 to 11. Sanders has appealed his convictions and sentences, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Sanders's appellate contentions broadly manifest in four different forms — with additional issues nested therein. Those four broad contentions are: first, that the district court erred in denying motions to suppress evidence seized pursuant to a search warrant for his residence, plus Sanders's related efforts to inquire into alleged misrepresentations in the Affidavit; second, that the court erred in admitting statements Sanders made to FBI agents during the search of his residence; third, that the court improperly excluded

21

purported evidence of the victims' voluntary participation in the production of child pornography, including expert testimony about BDSM culture; and, fourth, that the court erred in giving the jury the Consent Instructions, the Purpose Instruction, and the Lascivious Instruction.

## A.

Sanders's principal contention on appeal is that all of his convictions should be reversed on Fourth Amendment grounds. More specifically, he argues that the district court's Suppression Opinion erroneously denied his various motions to suppress, in ruling that the February Warrant was facially valid. Alternatively, Sanders contends he was entitled to a *Franks* hearing and discovery under Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure.

## 1.

We begin by reviewing whether the magistrate judge had a substantial basis for finding probable cause to support the issuance of the February Warrant. As a general proposition, the legal conclusions underlying the denial of a motion to suppress are reviewed de novo, and the court's factual findings relating thereto are reviewed for clear error. *See United States v. Kolsuz*, 890 F.3d 133, 141-42 (4th Cir. 2018). Because a magistrate judge issued the February Warrant, however, "our task isn't to assess probable cause de novo," rather, "we apply a deferential and pragmatic standard to determine whether the judge had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *See United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (internal quotation marks omitted). And in assessing a suppression ruling, "we view the

22

evidence in the light most favorable to the prevailing party below." *See United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004).

The Government is generally obliged to obtain a search warrant prior to searching a residence. *See* U.S. Const. amend. IV. And a search warrant must be supported by probable cause. *See Fernandez v. California*, 571 U.S. 292, 298 (2014). Probable cause is not a high bar, requiring only "a fair probability that contraband or evidence of a crime will be found in a particular place." *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). And we readily acknowledge — as a general proposition — that a "single click" of an Internet link will not establish probable cause to search a residence for evidence of child pornography. That is, unless there are solid additional facts to suggest that "the person behind that click plausibly knew about and sought out" child pornography. *See Bosyk*, 933 F.3d at 326.

Several pertinent facts spelled out in the Affidavit establish beyond doubt that the magistrate judge had a substantial basis to issue the challenged February Warrant:

- The Foreign Agency — known to be reliable — had notified the FBI that the target IP address had accessed online child sexual abuse and exploitation material on Hurt Meh.

- The Hurt Meh website was a TOR hidden service, and therefore accessible only through the TOR network, making it "extremely unlikely that any user could simply stumble upon [Hurt Meh] without first understanding its purpose and content." *See* J.A. 1450.

- To access the child sexual abuse and exploitation material on Hurt Meh, an Internet user would have to register an account.

- Individuals with a sexual interest in children are known to possess, collect, and maintain child pornography in an electronic format on computers.

23

- • Due to the nature of electronic storage, even if an individual deletes child pornographic material, evidence of the material remains on the computer for an extended period.

Although this search warrant relied on a single instance of accessing child pornography on the Hurt Meh website, the requisite affirmative steps to access that website and the pornographic material thereon strongly suggest that the Internet user knew that such content was located on the site and had actively sought out such material.

Our 2019 decision in *United States v. Bosyk* is very instructive. *See Bosyk*, 933 F.3d 319. In *Bosyk*, the DHS was investigating a particular TOR hidden service, which was a website dedicated to advertising and distributing child pornography. *Id.* at 322. One day a link appeared on this hidden website (the "Link"), which was accompanied by a message graphically describing the contents of the Link, making it unmistakable that the contents were child pornography. Importantly, the Link was to an open Internet site, i.e., not a TOR hidden service. That same day, an IP address associated with the defendant's residence accessed the Link. The prosecutors did not have an electronic record establishing whether Bosyk's IP address had ever visited the TOR hidden service.

Despite the absence of direct evidence that Boysk had previously visited the TOR hidden service and viewed the incriminating description of the Link's contents, we relied on the circumstantial facts to establish that Boysk had probably accessed the TOR hidden service. *See Bosyk*, 933 F.3d at 330. That is, we ruled that there were sufficient additional facts to show that the person who accessed the link knew it contained child pornography, in that (1) the Link was accessed the same day it was posted on the TOR hidden service

24

with the incriminating description; and (2) because the methods of disseminating child pornography on the Internet made more innocent routes — e.g. stumbling onto the Link while browsing benign Internet content — less likely.

Here, the circumstantial gap is not nearly as wide as that which existed in *Boysk*. Unlike in *Boysk*, this Affidavit revealed that Sanders's IP address not only accessed a TOR hidden service — Hurt Meh — but had "accessed online child sexual abuse and exploitation material" using that site. *See* J.A. 1447. To access the website's illegal material, a user had to engage in several affirmative steps, including using the TOR browser, locating the obscure web address, and registering an account with Hurt Meh.[14] Additionally, the chain of affirmative steps makes Sanders's innocent explanations for accessing the abuse and exploitation material very doubtful. Thus, there are sufficient additional facts to suggest that "the person behind that click plausibly knew about and sought out" child pornography. *See Bosyk*, 933 F.3d at 326.

We are also not impressed by Sanders's appellate contention that the facts in the Affidavit were so "stale" as to negate probable cause. Sanders emphasizes, of course, the approximately nine-month period that elapsed between the time Sanders's IP address accessed the child pornography on Hurt Meh in May 2019 and the issuance of the February Warrant. And indeed, "there is no question that time is a crucial element of probable

---

[14] Sanders argues that the Government has no evidence that he ever registered an account with Hurt Meh. This assertion ignores the fact that the Foreign Agency advised the FBI that Sanders's IP address had accessed child pornography on Hurt Meh — which would not grant access until a user registered with it.

25

cause," and "evidence seized pursuant to a warrant supported by 'stale' probable cause is not admissible." *See United States v. McCall*, 740 F.2d 1331, 1335-36 (4th Cir. 1984). The question of whether probable cause is stale, however, "must be determined by the circumstances of each case." *See Sgro v. United States*, 287 U.S. 206, 211 (1932). And we have recognized that the "staleness inquiry is unique in [the] child pornography context." *See Bosyk*, 933 F.3d at 330. That is — due to (1) the tendency of individuals who intentionally access to collect child pornography, and (2) the material's electronic nature causing evidence of collection to be recoverable long after it is deleted — search warrants can reasonably be sustained "months, and even years, after the events that gave rise to probable cause." *Id.* at 331 (ruling that search warrant issued five months after "click" was valid). Here, the Affidavit conveyed the same critical information to the magistrate judge — the person who deliberately accessed the pornographic material on the Hurt Meh website probably had a sexual interest in children and was therefore likely to be a collector of child pornography. And the evidence of such activity would be recoverable for long periods of time, even after the pornographic material had been deleted from the computer.

Thus, the record evidence convincingly reveals that the magistrate judge was correct, and had a substantial basis for concluding that probable cause existed and supported issuance of the February Warrant. And because of the nature of child pornography — including the unique nature of such unlawful activity and the contraband to be seized — probable cause was not at all "stale."

26

2.

Next, Sanders contends that, even if the Affidavit is sufficient to support probable cause, he was nevertheless entitled to a *Franks* hearing and the Suppression Opinion erroneously denied him that opportunity. More specifically, Sanders argues that Agent Ford "baldly misrepresented the tip documents received by the FBI" in ¶ 23 of the Affidavit by swearing that a user of the subject IP address had "access[ed] online child sexual abuse and exploitation material via [Hurt Meh]." *See* Appellant's Br. 18.[15] We review legal determinations underlying the denial of Sanders's *Franks* hearing de novo, while the court's related factual findings are reviewed for clear error. *See United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).

A defendant is entitled to attack an otherwise facially valid search warrant affidavit under the "narrow exception" created in *Franks v. Delaware*, 438 U.S. 154 (1978). To obtain a "*Franks* hearing," the defendant "must make a substantial preliminary showing that the affiant made (1) a false statement (2) knowingly and intentionally, or with reckless disregard for the truth that was (3) necessary to the finding of probable cause." *See United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (internal quotation marks omitted).

In assessing the *Franks* issue, the Suppression Opinion concluded that a comparison between the August Report from the Foreign Agency and ¶ 23 reveals no meaningful difference or falsity. As a result, Sanders's request for a *Franks* hearing faltered on the

---

[15] Although Sanders also argued to the district court that Agent Ford's alleged misrepresentation in ¶ 25 supported his request for a *Franks* hearing, Sanders has not pursued that proposition on appeal.

first prong.  Our own comparison reaches the same result.  The August Report recited, in relevant part, that Sanders's IP address:

> [W]as used to *access online child sexual abuse and exploitation material*, with an explicit focus on the facilitation of sharing child abuse material (images, links and videos), emphasis on BDSM, hurtcore, gore, and death-related material including that of children.  Users were required to create an account (username and password) in order to access the majority of the material.

*See* J.A. 1406 (emphasis added).  Paragraph 23 of the Affidavit stated as follows:

> In August 2019, [the Foreign Agency] . . . notified the FBI that the [Foreign Agency] determined that on May 23, 2019, a user of [Sanders's] IP address *accessed online child sexual abuse and exploitation material via a website* that the [Foreign Agency] named and described as [Hurt Meh].

*Id.* at 1447 (emphasis added).

On appeal, Sanders contends that "the only sensible way to understand the [August Report] is that it reported access *to the website*, not to specific images," and therefore the Report only suggests that Sanders visited Hurt Meh's "plain vanilla homepage."  *See* Appellant's Br. 18-20.  Not so — the August Report makes it quite clear that child pornography was accessed.  Nowhere does the August Report state that the Internet user merely visited Hurt Meh's homepage.  And the fact that Hurt Meh's homepage does not display child pornography in no way alters the fact that the Affidavit accurately reiterated the August Report.

Sanders also argues that Agent Ford's inclusion of the term "via a website" in ¶ 23 fundamentally alters the meaning of the August Report.  But the August Report explicitly stated that child pornography was accessed online, and an Internet user cannot access such pornographic material without first accessing a website that distributes it.  Although the

term "via a website" is found nowhere in the August Report, it is a readily understandable phrase used to naturally describe how the pornographic material was accessed. In these circumstances, the Suppression Opinion properly rejected Sanders's request for a *Franks* hearing.

3.

Next, we turn to Sanders's contention that the district court improperly denied his motion to compel discovery pursuant to Rule 16(a)(1)(E). A denial of such discovery, however, is reviewed for abuse of discretion only. *See United States v. Caro*, 597 F.3d 608, 616 (4th Cir. 2010).

Rule 16(a)(1)(E) affords a defendant a right to obtain discovery of any item "within the government's possession" if "the item is material to preparing the defense." *See* Fed. R. Crim. P. 16(a)(1)(E). To establish materiality, the defendant bears the burden of showing "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *See Caro*, 597 F.3d at 621 (internal quotation marks omitted). A conclusory allegation of materiality does not satisfy the defendant's burden. *Id.*

Sanders sought evidence from the Government to aid his *Franks* argument and his suppression motions. Specifically, Sanders wished to pursue discovery to support his theory that Agent Ford had (1) knowingly misrepresented the August Report in ¶ 23 of the Affidavit, and (2) misled the magistrate judge by swearing — in ¶ 25 of the Affidavit — that the Foreign Agency had not interfered with any device in the United States when it generated its August Report.

29

We agree with Sanders that evidence altering the quantum of proof in a defendant's favor concerning either a *Franks* motion or a suppression motion would satisfy the materiality standard of Rule 16(a)(1)(E).  Nevertheless, we find no reversible error in the district court's ruling that Sanders did not present sufficient facts "indicating that the [requested] information would have actually helped prove his defense." *See Caro*, 597 F.3d at 621.  More specifically, as to Sanders's contention regarding ¶ 23, there is no misrepresentation included in ¶ 23.  Thus, we agree with the trial court that an inquiry into the so-called "misrepresentation" is unnecessary.  Regarding ¶ 25, the information conveyed therein is the same as that contained in the reports provided by the Foreign Agency.  That is, both ¶ 25 of the Affidavit and the contents of the Foreign Agency's reports show that the Foreign Agency had not interfered with any computer in the United States in order to obtain the target IP address. *See* J.A. 1408, 1447-48.

Sanders argued to the district court that, even if ¶ 25 accurately restates the information provided by the Foreign Agency, Agent Ford should have known that it was technologically implausible for the Foreign Agency to obtain the IP address without interfering with a domestic computer.  To support this proposition, Sanders relied on declarations of his experts and affidavits by FBI agents in prior investigations. The court ruled against him, however, explaining that those arguments were unpersuasive, because (1) the expert declarations only speculated that the Foreign Agency had interfered with a domestic computer, and (2) a subsequent affidavit provided by Agent Ford, which established that he knew about methods of de-anonymizing TOR users that do not require interference with the user's computer.

30

Although Sanders insists that the district court improperly weighed the strength of his arguments, we are reviewing a Rule 16(a)(1)(E) ruling for abuse of discretion only. And Sanders has identified no errors of law or erroneous factual determinations by the court. We thus also reject Sanders's Rule 16 contentions.[16]

B.

Sanders maintains on appeal that his statements to the FBI agents during the February 12 search of his residence should be suppressed as unconstitutional under the Fifth Amendment. The district court ruled, however, that Sanders's suppression effort was fatally untimely and that he had failed to establish "good cause" to excuse his tardy filing. We review a court's finding on a lack of good cause under Rule 12(c)(3) for abuse of discretion. *See United States v. Mathis*, 932 F.3d 242, 256 (4th Cir. 2019).

Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, a motion for the suppression of evidence must be presented prior to trial or by the deadline established by the district court, "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." *See* Fed. R. Crim. P. 12(b)(3)(C), 12(c). If a defendant fails to satisfy such a deadline, he has waived his right to pursue a suppression motion. *Id.* 12(c)(3); *see also Mathis*, 932 F.3d at 256; *United States v. Sweat*, 573 F. App'x 292, 295 (4th Cir. 2014). A court can only consider an untimely suppression

---

[16] Sanders also argues that this Country and the Foreign Agency were in some joint venture where we would outsource the FBI's investigative process to the Foreign Agency. We see no abuse of discretion in the district court's conclusion that this assertion is "pure hopeful speculation." *See* J.A. 1580.

31

motion if the moving party can show good cause for the untimeliness. *See* Fed. R. Crim. P. 12(c).

Here, the district court ruled that Sanders had failed to show good cause for his 112-day delay. In assessing whether good cause had been established, the court ruled (1) that the motion and corresponding evidentiary hearing would be certain to delay the trial, (2) that Sanders had given no adequate or persuasive reason for his 112-day delay in filing the motion, (3) that the untimely motion would prejudice the Government as it prepared for trial, and (4) that Sanders had made no plausible argument about new information alerting him to new or additional facts on which the motion could be based. *See* J.A. 291-93.[17]

On appeal, Sanders does not claim that the district court abused its discretion in ruling that he did not establish good cause, nor does he contest the propriety of the legal test applied by the court. He simply emphasizes that he filed his motion "nearly two months before the then-scheduled trial date" and that he renewed his motion when the trial was later delayed. *See* Appellant's Reply Br. 24. But the court carefully addressed the timing of the trial, along with the rescheduled trial dates, in its various rulings. Absent an argument on why and how the court abused its discretion, we are constrained to conclude

---

[17] In ruling that Sanders had failed to establish good cause, the court utilized the framework provided by *United States v. Samuel*, 1:14-cr-351, 2015 WL 1442884 (E.D. Va. Mar. 26, 2015), at *3 (ruling that "courts generally consider (i) the extent of the untimeliness, (ii) the reason for late filing, (iii) prejudice to the other party, and (iv) whether the receipt of additional information after the filing deadline alerted defendant to facts on which a motion to suppress might be based" to determine whether a party has demonstrated good cause for untimely suppression motion.).

32

that the court did not reversibly err in denying the suppression effort as untimely and without good cause.

Sanders also maintains that his suppression effort concerning the interview was not waived because the district court was required by 18 U.S.C. § 3501(a) to "determine any issue as to voluntariness" before admitting his statements at trial. *See* 18 U.S.C. § 3501(a). Sanders, however, then concedes that the court complied with § 3501(a) when it "ultimately made a voluntariness finding." *See* Appellant's Reply Br. 24; *see also* J.A. 2726 n.13. And the court's compliance with § 3501(a) would not displace its earlier waiver ruling. *See United States v. Moore*, 769 F.3d 264, 268 (4th Cir. 2014).[18]

C.

Next, we address Sanders's challenges to the district court's evidentiary rulings concerning exclusion of (1) the voluntary participation of the various minors in the sexually explicit conduct and (2) the proposed expert testimony of Dr. Berlin. Principally, Sanders argues that the court improperly interpreted the elements of the Production Charges, the

---

[18] Even if we were to review the district court's voluntariness ruling, we are satisfied that it was correct — based on "the totality of the circumstances" — and that Sanders's Fifth Amendment rights were not violated. *See United States v. Giddins*, 858 F.3d 870, 880 (4th Cir. 2017). Sanders was interviewed in his own home, permitted to interrupt the interview to talk to his mother, was informed he was not under arrest, and never "expressed his desire to deal with the police only through counsel." *See Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Although the circumstances of the interview may have been intimidating, the record reveals that the intimidation was "no greater than that which is characteristic of police questioning generally," and was insufficient to transform the interview into a custodial interrogation. *See United States v. Azua-Rinconada*, 914 F.3d 319, 326 (4th Cir. 2019).

33

Receipt Charges, and the Possession Charge. He thus argues that those improper interpretations resulted in the court erroneously deciding that the evidence was irrelevant.

Generally, we review a trial court's rulings on the admission of evidence for abuse of discretion. *See Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 221 (4th Cir. 2020). And insofar as a trial court excludes evidence under Rule 403, we afford the court broad discretion — overturning an evidentiary ruling only "under the most extraordinary circumstances, where that discretion has been plainly abused." *See United States v. Udeozor*, 515 F.3d 260, 265 (4th Cir. 2008).

1.

To understand Sanders's evidentiary contentions, we will recite the applicable legal principles. Sanders argues that the Government was required — on each of the criminal offenses being tried — to prove that the will of the depicted minor was overcome during the production of the pornographic material. He further contends that a minor child's voluntary participation in the production of pornographic material would tend to establish that his will was not overcome.

We begin by reviewing the five Production Charges under § 2251(a), which imposes criminal penalties on

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct.

*See* 18 U.S.C. § 2251(a). Sanders maintains that the word "uses" in § 2251(a) must be interpreted narrowly, and requires that the defendant "overcome the will of the minor

34

participants." *See* Appellant's Br. 32.  Put differently, Sanders argues that proof of "uses" requires "some action to achieve assent" of the minor boy.  *Id.* at 34.

This proposition is, as the trial court ruled, without merit.  The term "uses" is not defined in § 2251(a), and we must apply its ordinary meaning.  *See United States v. George*, 946 F.3d 643, 646 (4th Cir. 2020).  And the ordinary meaning of "uses" includes "to put into action or service," "avail oneself of," or "employ."  *See Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/use  [https://perma.cc/5P95-7MH9] (last visited June 10, 2024).  This meaning is confirmed by *Black's Law Dictionary*, which defines "use" as "[t]o employ for the accomplishment of a purpose" or "to avail oneself of."  *Use*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Importantly, the definition of "uses" in § 2251(a) is not a question of first impression for this Court.  We have heretofore ruled that the ordinary meaning of "uses" does not require a defendant to overcome the will of the minor or obtain the minor's assent.  *See United States v. Engle*, 676 F.3d 405, 418 n.9 (4th Cir. 2012) ("A defendant 'uses' a minor for purposes of § 2251(a) if he photographs the minor engaging in sexually explicit conduct to create a visual depiction of such conduct.").[19]

---

[19] We are not alone in the view that the term "uses" does not require a defendant to overcome the will of the minor child.  The First, Second, Sixth, Eighth, Tenth, and D.C. Circuits uniformly agree — "uses" can be satisfied by photographing the child to create child pornography, regardless of whether the child assented to the photography, or if their participation was voluntary.  *See Ortiz-Graulau v. United States*, 756 F.3d 12, 17-18 (1st Cir. 2014); *United States v. Sirois*, 87 F.3d 34, 41 (2d Cir. 1996); *United States v. Wright*, 774 F.3d 1085, 1091 (6th Cir. 2014); *United States v. McCloud*, 590 F.3d 560, 566 (8th Cir. 2009); *United States v. Theis*, 853 F.3d 1178, 1181 (10th Cir. 2017); *United States v. Hillie*, 39 F.4th 674, 691 (D.C. Cir. 2022).

We will thus decline Sanders's invitation to reinterpret the term "uses" to require a defendant to "overcome the will of the minor." Not only are we bound by precedent, but the phrase "overcome the will of the minor" is found nowhere in § 2251. And Sanders has pointed us to no authority supporting his proposed interpretation.

Despite Sanders's contention to the contrary, the plain meaning of the word "uses" is bolstered — rather than diminished — by "the company it keeps," and the doctrine of *noscitur a sociis* (Latin for "it is known by its associates"). *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). As pointed out by the Ninth Circuit, one of the other means of violating § 2251(a) — to "employ" the minor child — is listed as an ordinary synonym for "use." *See United States v. Laursen*, 847 F.3d 1026, 1032 (9th Cir. 2017).

Additionally, we readily reject Sanders's contention that our interpretation of "uses" would render the other verbs superfluous. As highlighted by the First Circuit — our shared interpretation of the term "uses" reaches a defendant's active involvement in the production of the pornographic material even when "the interpersonal dynamics between the defendant and the depicted minor are unknown" but "the terms employ, persuade, induce, entice, and coerce reach various types of external pressure that a defendant might apply on a minor to get him or her to engage in sexually explicit conduct." *See Ortiz-Graulau v. United States*, 756 F.3d 12, 19 (1st Cir. 2014).

The inclusion of a list of similar verbs in § 2251(a) indicates that Congress intended to criminalize as broad of a range of conduct as possible — rather than to narrow the proscribed conduct. *See United States v. Helton*, 944 F.3d 198, 208 (4th Cir. 2019) (ruling that Congress's use of "broad terms without limiting them or defining them" reflects its

36

decision to utilize sweeping ordinary meaning); *see also Ortiz-Graulau*, 756 F.3d at 19. And "[g]iven Congress's broad interest in preventing sexual exploitation of children," — i.e., persons who are vulnerable and unable to legally consent — our existing application of the term "uses" is eminently rational. *See United States v. Malloy*, 568 F.3d 166, 179 (4th Cir. 2009).

Turning to the six Receipt Charges and single Possession Charge — governed by § 2252(a)(2)(A) and § 2252(a)(4)(B)(i) — Sanders argues that his proposed narrow interpretation of "uses" in § 2251(a) is similarly applicable to those statutory provisions as well. Those provisions apply only when the production of the visual depiction "involves the *use* of a minor engaging in sexually explicit conduct." *See* 18 U.S.C. §§ 2252(a)(2)(A), 2252(a)(4)(B)(i) (emphasis added). Again, Sanders points to no statutory language or court decision supporting his interpretation. We therefore decline to rule that the verb "use" requires the Government to prove — in every prosecution for receipt or possession of child pornography under §§ 2252(a)(2) or 2252(a)(4)(B) — that the production of the visual depiction involved "overcoming the will of the minor."

### 2.

Now having briefly reviewed the applicable legal principles, we turn to the district court's ruling that evidence of the minors' voluntary participation in the production of pornographic material was inadmissible under Rule 402 of the Federal Rules of Evidence. Irrelevant evidence — as defined by Rule 401 of the Federal Rules of Evidence — is inadmissible under Rule 402. *See* Fed. R. Evid. 402. Rule 401 provides that evidence is "relevant" if "it has any tendency to make a fact more or less probable" and "the fact is of

consequence in determining the action." *See* Fed. R. Evid. 401. Consequently, what constitutes relevant evidence depends on the facts of the case, the nature of the charges, and the associated defenses.

Put succinctly, the district court was correct — no matter how it is phrased — that a minor's consent, assent, or voluntary participation, does not go to any element or defense of Sanders's various offenses. The court properly read and applied §§ 2251(a), 2252(a)(2), and 2252(a)(4)(B) to mean that evidence of the minors' voluntary participation in the production of the pornographic material was irrelevant. And in affirming the court, we join the other courts of appeals that have ruled similarly. *See United States v. Wells*, 843 F.3d 1251, 1255 (10th Cir. 2016); *United States v. Raplinger*, 555 F.3d 687, 692 (8th Cir. 2009); *see also United States v. Sibley*, 681 F. App'x 457, 461 (6th Cir. 2017).[20]

3.

Next, we address the district court's exclusion of the expert testimony of Dr. Berlin. The court considered two subsets of Dr. Berlin's testimony — (1) testimony concerning the consensual and non-sexual components of BDSM relationships, and (2) testimony concerning various terms utilized within his views of BDSM culture.

---

[20] The district court also excluded evidence of the minors' voluntary participation under Rule 403. And we have identified no situation where the court "plainly abused" its discretion to exclude evidence under Rule 403. *See Udeozor*, 515 F.3d at 265. Accordingly, we agree that the exclusion rulings were also proper under Rule 403.

a.

Insofar as Dr. Berlin would have testified about the consensual and non-sexual elements of a BDSM relationship — the court excluded such testimony as irrelevant. And, as discussed above the court was correct in that exclusion ruling, and thus did not err in excluding that portion of Dr. Berlin's testimony as irrelevant.

Sanders maintains that the existence of a "non-sexual component" of BDSM relationships would tend to undermine his knowledge that the material depicted "sexually explicit conduct." *See* Appellant's Br. 43. This "non-sexual component" argument, however, is necessarily intertwined with testimony regarding the minors' voluntary participation in the BDSM relationships. And the court emphasized that such expert testimony would "mislead the jury into believing that the minor victims' alleged consent to production of these images is exculpatory," and is therefore excludable under Rule 403. *See* J.A. 2758.

We afford trial courts "broad discretion" to determine whether the probative value of proposed evidence would outweigh the danger of misleading the jury. *See Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 713 (4th Cir. 2021). And we will overturn such a ruling only "under the most extraordinary circumstances, where that discretion has been plainly abused." *See Udeozor*, 515 F.3d at 265. Here, no such abuse of discretion occurred.

b.

Second, the district court excluded the balance of Dr. Berlin's testimony as to the use of various terms by BDSM culture — e.g., sub, dom, master, and slave. The court

39

ruled that such testimony was inadmissible, in that the terms' meanings were not beyond the knowledge of the average juror. To be admissible, Rule 702 of the Federal Rules of Evidence requires that the expert's testimony "will help the trier of fact." *See* Fed. R. Evid. 702(a). To determine whether expert testimony will assist the trier of fact, we have instructed the trial courts to consider "whether the testimony presented is simply reiterating facts already within the common knowledge of the jurors." *See United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995). And we accord trial judges "a great deal of discretion" in making such determinations. *Id.*

Indeed, expert testimony on relevant jargon and related terms may be helpful to a jury in some situations. *See, e.g.*, *United States v. Simmons*, 923 F.2d 934, 946 (2d Cir. 1991) (admitting expert testimony explaining terms "used by narcotics dealers to camouflage their activities"); *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (ruling that expert testimony helps explain "unfamiliar terms and concepts"). But again, expert opinions are not generally necessary to interpret terms or phrases that jurors can understand on their own.

Aside from conclusory statements that certain terms have unfamiliar meanings as used in the BDSM context, Sanders offers little reason why the district court abused its discretion in ruling that the various terms "are not so different from their common meaning as to require expert explanation." *See* J.A. 2758. Sanders offers only one example of how the common meaning of these terms would vary from their meaning within BDSM culture — that is, Dr. Berlin would testify that the subject terms do not "convey some measure of coercion." *See* Appellant's Br. 46. Such an argument is — once again — an attempt to

40

introduce evidence of the voluntary participation of the minor boys. As discussed above, the court was correct in excluding such evidence.

We observe that, prior to the district court excluding the proposed testimony of Dr. Berlin, the court and the jury had already heard from Sanders about what he understood the subject terms to mean in the BDSM context. Thus, the court was well situated to assess whether the various terms sufficiently varied from their common meanings to warrant an expert's explanation. Again, we are satisfied that the court did not abuse its discretion in this context.

## D.

Finally, we turn to Sanders's contentions of error regarding the trial court's jury instructions — specifically, the Consent Instructions, the Purpose Instruction, and the Lascivious Instruction. On direct appeal, "[w]e review a district court's decision to give a particular jury instruction for abuse of discretion, and review whether a jury instruction incorrectly stated the law de novo." *See United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018). In so doing, "we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *See United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). We also review for abuse of discretion a trial court's decision not to give an instruction, reversing only if the proposed instruction "(1) was correct, (2) was not substantially covered by the charge that the court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense." *See United States v. Raza*, 876 F.3d 604, 614 (4th Cir. 2017).

41

1.

Sanders first argues that the trial court's Consent Instructions — which informed the jury that a minor's consent or voluntary participation in the production of the pornographic material was irrelevant — were legally erroneous. To support this argument, Sanders relies on his interpretation of the terms "uses" and "use" as found in 18 U.S.C. § 2251(a), § 2252(a)(2), and § 2252(a)(4)(B). That is, he argues that those terms require that the production of the material involved overcoming the will of the minor. Again, we reject Sanders's proposed interpretations and thus are satisfied that the court did not err in giving the Consent Instructions.

2.

Turning to the Purpose Instruction, Sanders contends on appeal that the district court fundamentally misconstrued the statute, and that the statute actually mandates the jury to find that producing child pornography is a defendant's "predominant" purpose. The court, in the Purpose Instruction, explained that the prosecution was required to prove that "[t]he production of a visual depiction of sexually explicit conduct" was "a significant or motivating purpose of the defendant, and not merely incidental to engaging in the sexually explicit conduct." *See* J.A. 573. The "motivating purpose" language was also used in two midtrial instructions.

Section 2251(a) of Title 18 requires proof that the defendant used a minor to engage in sexually explicit conduct "for the purpose of producing any visual depiction of such conduct." Our Court, in our 2020 *McCauley* decision, acknowledged that § 2251(a)'s use of "*the* purpose," rather than "*a* purpose," means that the purpose of production must

42

"carr[y] some predominant weight." *See United States v. McCauley*, 983 F.3d 690, 695 (4th Cir. 2020) (emphasis added). That is, use of the phrase "'the purpose' requires that the filming be at the very least a significant purpose in the sexual conduct itself, not merely incidental." *See McCauley*, 983 F.3d at 695. It is this distinction — between a "significant" purpose and a "merely incidental" purpose — that is critical. *Id.* at 696-97. We have also explained that "[w]hether an instruction reads 'the purpose,' 'the dominant purpose,' '*a motivating purpose*' — or some other equivalent variation — may not be crucial, but the statute plainly requires something more than 'a purpose.'" *Id.* at 697 (emphasis added).

It is readily evident that the Purpose Instruction was not erroneous. It acknowledges the distinction drawn in *McCauley* — adequately contrasting "a significant or motivating purpose" from a "merely incidental" purpose. Indeed, by the Purpose Instruction and its related midtrial instructions, the court utilized a recognized "equivalent variation" of the phrase "the dominant purpose" — that is, a "motivating purpose." And, in 2020, this Court affirmed the use of an instruction with the "significant or motivating purpose" language. *See United States v. Thompson*, 807 F. App'x 251, 252 (4th Cir. 2020). Thus, we reject Sanders's claim of error in this regard.[21]

---

[21] Rule 30(d) of the Federal Rules of Criminal Procedure provides that, in order to preserve an appellate challenge to a jury instruction, a party "must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." *See* Fed. R. Crim. P. 30(d). The Government maintains that we are obliged to review the Purpose Instruction contention pursued by Sanders for plain error only, because he failed to object to it at the charge conference. Because there was no error in the Purpose Instruction — plain or otherwise — we need not decide the issue of whether plain error applies.

43

3.

Sanders also contends that the district court's Lascivious Instruction was erroneous because the court had relied on and adopted the *Dost* Factors. More specifically, Sanders argues that it "invited the jury to convict based on nothing more than simple nudity" or to convict on "a finding that the material was designed to elicit a sexual response in the viewer." *See* Appellant's Br. 41. And Sanders complains that the court declined to instruct that a lascivious exhibition of the genitals means a depiction "showing a minor engaged in . . . hard core sexual conduct." *See* J.A. 3740, *see also* Appellant's Br. 41-42. After identifying the applicable principles, we examine each contention in turn.

a.

The district court defined the term "lascivious exhibition" because each of the twelve charges required the Government to prove that the visual depictions in question connoted a minor engaged in "sexually explicit conduct." 18 U.S.C. § 2251(a), § 2252(a)(2), and § 2252(a)(4)(B). And "sexually explicit conduct," includes, in relevant part, a "lascivious exhibition of the anus, genitals, or pubic area of any person." *See* 18 U.S.C. § 2256(2)(A)(v). Congress, however, did not expressly define the phrase "lascivious exhibition."

To aid in determining the meaning of "lascivious exhibition" a California district court — in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986) — developed six factors nearly 40 years ago for the trier of fact to consider in a case such as this:

(1)  whether the focal point of the visual depiction is on the child's genitalia or pubic area;

44

(2)    whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

(3)    whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

(4)    whether the child is fully or partially clothed, or nude;

(5)    whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

(6)    whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*See Dost*, 636 F. Supp. at 832. The *Dost* court further explained that

a visual depiction need not involve all of these factors to be a "lascivious exhibition of the genitals or pubic area." The determination will have to be made based on the overall content of the visual depiction, taking into account the age of the minor.

*Id.* In its Lascivious Instruction, the district court adopted — nearly verbatim — the *Dost*

Factors when it instructed the jury as to a lascivious exhibition. *See* J.A. 584-85.

Although the *Dost* Factors have been subjected to criticism over the years, nine of

our sister courts of appeals have adopted or endorsed them to aid in determining whether a

certain visual depiction connotes a lascivious exhibition.[22] *See United States v. Frabizio*,

459 F.3d 80, 87 (1st Cir. 2006); *United States v. Rivera*, 546 F.3d 245, 250 (2d Cir. 2008);

---

[22] As highlighted by the Second Circuit, one underlying concern of many *Dost*-factor critics seems to be that the factors are "over-generous to the defendant." *See United States v. Rivera*, 546 F.3d 245, 251 (2d Cir. 2008) (internal quotation marks omitted); *see also Frabizio*, 459 F.3d at 88; *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir.). This appeal does not afford us an opportunity to assess whether the *Dost* Factors are overly generous to defendants, as this appeal is by the defendant and the Government does not pursue such an issue.

45

*United States v. Villard*, 885 F.2d 117, 122 (3d Cir. 1989); *United States v. Steen*, 634 F.3d 822, 826 (5th Cir. 2011); *United States v. Brown*, 579 F.3d 672, 680 (6th Cir. 2009); *United States v. Petroske*, 928 F.3d 767, 773 (8th Cir. 2019); *United States v. Perkins*, 850 F.3d 1109, 1121 (9th Cir. 2017); *United States v. Isabella*, 918 F.3d 816, 831 (10th Cir. 2019); *United States v. Hunter*, 720 F. App'x 991, 996 (11th Cir. 2017).  But our Court has neither adopted nor rejected the *Dost* Factors.  *See Courtade*, 929 F.3d at 192 (4th Cir.).

Two of the thirteen courts of appeals seem to have rejected the *Dost* Factors.  The Seventh Circuit — ruling that it was not plain error to instruct on the *Dost* Factors — discouraged their "routine use" because a juror's "common understanding" is enough to identify lascivious exhibition.  *See United States v. Price*, 775 F.3d 828, 840 (7th Cir. 2014).  The D.C. Circuit, on the other hand, declined to adopt the *Dost* Factors because it interpreted a lascivious exhibition to mean a visual depiction "showing a minor engaged in 'hard core' sexual conduct" — something that the *Dost* Factors do not require.  *See United States v. Hillie*, 39 F.4th 674, 688 (D.C. Cir. 2022).

b.

Sanders complains that the Lascivious Instruction was "freewheeling," and that the *Dost* Factors invited the jury to convict him based on either "nothing more than simple nudity," or a finding that the visual depictions subjectively elicited a sexual response in the viewer.  *See* Appellant's Br. 41.  That is, he targets the fourth and sixth *Dost* Factors, and asserts they are prejudicial.

Indeed, instructing the jury that it may convict based on simple nudity may be erroneous.  *See Courtade*, 929 F.3d at 191 (ruling of this court that 18 U.S.C.

46

§ 2256(2)(A)(v) "requires more than mere nudity"). Additionally, allowing a jury to convict solely because the defendant subjectively found the visual depictions arousing "would be engaging in conclusory bootstrapping," because "[c]hild pornography is not created when the pedophile derives sexual enjoyment from an otherwise innocent photo." *See Villard*, 885 F.2d at 125; *see also United States v. Amirault*, 173 F.3d 28, 34 (1st Cir. 1999); *Rivera*, 546 F.3d at 252; *United States v. Wiegand*, 812 F.2d 1239, 1245 (9th Cir. 1987). The Lascivious Instruction, however, did not permit the jury to make either of those conclusions.

For starters, the Lascivious Instruction did not advise the jurors that they could convict on nudity alone. *See* J.A. 584 ("For the visual depiction of an exhibition of the genitals . . . to be considered sexually explicit conduct, the exhibition must be lascivious"). Rather, the Lascivious Instruction stated that the jury could consider the extent of nudity in deciding whether the visual depiction is lascivious. Certainly, the extent that nudity is used in a depiction is helpful guidance in determining whether the visual depiction is lascivious. Second — as to the sixth factor — nowhere does the instruction provide that the subjective arousal of the viewer is the relevant inquiry. In fact, that factor explicitly provides that the jury is to look at "whether the *visual depiction* is *intended or designed* to elicit a sexual response," not whether a sexual response was elicited. *Id.* at 585 (emphasis

47

added).  In our view, both *Dost* Factors — the fourth and sixth — could aid a jury in determining whether the visual depiction is lascivious.[23]

Additionally, any concern that the Lascivious Instruction confused the jury about whether a visual depiction was lascivious based solely on either nudity or the subjective reaction of a defendant is diminished in this situation by the district court's comprehensive explanation.  The Lascivious Instruction emphasized that the *Dost* Factors were only a guide — non-exhaustive and discretionary.  Indeed, the court expressly told the jury that it "*may* consider the following factors," i.e., the *Dost* Factors.  *See* J.A. 585 (emphasis added).

The Lascivious Instruction also confirmed that the *Dost* Factors are not definitional by providing that a visual depiction "need not involve all of these factors" and that the jury is permitted to decide the appropriate weight for each factor.  *See* J.A. 585.  Importantly, the Instruction discouraged the jury from relying on a single factor — stating that whether a depiction portrays a lascivious exhibition requires consideration of the "overall context" and "overall content" of the visual depiction.  *Id.* at 584-85.  Put succinctly, the court properly instructed the jury that the *Dost* Factors "are not mandatory, formulaic or exclusive."  *See Rivera*, 546 F.3d at 253.

What the Lascivious Instruction accomplished, however, was that it gave the jury various neutral reference points to understand the term "lascivious exhibition" — a phrase

---

[23] The specific language of the sixth *Dost* Factor is similar to our definition of lascivious exhibition. That is, we define "lascivious exhibition" in the context of child pornography offenses to mean "a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer." *See Courtade*, 929 F.3d at 192.

48

that jurors are not likely to have familiarity with.  And as aptly put by the Second Circuit, neutral considerations "avoid decisions based on individual values or the revulsion potentially raised in a child pornography prosecution," and they "mitigate the risk that jurors will react to raw images in a visceral way."  *See Rivera*, 546 F.3d at 252-53.

In sum, the *Dost* Factors may not be necessary or helpful in every child pornography prosecution, but we are satisfied that the trial court did not err in using those Factors in these circumstances.  This appeal highlights, however, that trial courts should ensure that a jury (1) is not instructed to rely exclusively on the *Dost* Factors, (2) understands that no single *Dost* Factor is dispositive, and (3) is discouraged from a strict and mathematical application of the *Dost* Factors.

c.

Sanders's final contention about the Lascivious Instruction is that the court declined to inform the jury that the term "lascivious exhibition" means a depiction "showing the minor engaged in . . . hard core sexual conduct."  *See* J.A. 3740.  In so doing, Sanders champions the D.C Circuit's *Hillie* case, which ruled that a "lascivious exhibition of the anus, genitals, or pubic area of any person," as used in 18 U.S.C. § 2256(2)(A)(v) means a depiction of "hard core sexual conduct."  *See Hillie*, 39 F.4th at 682.  This Court's interpretation of the term lascivious exhibition, however, has never required the depiction to connote the minor engaging in sexual conduct.  In fact, we disclaimed such a requirement in our 2019 decision in *United States v. Courtade*, 929 F.3d 186 (4th Cir. 2019).

In *Courtade*, then-Chief Judge Gregory and our panel dealt with a minor child who was instructed by the defendant stepfather to shower with a camera "to see if the camera

49

was waterproof." *See Courtade*, 929 F.3d at 188.  The minor was deceived and was told that the camera was off and was not recording.  The camera — recording from both the bathroom counter and the floor of the shower — captured the minor child undressing and showering.  Courtade instructed the child on how to position the camera, which ensured that it recorded her nude body.  He also took an active role in filming the minor "deliberately angling the camera lens down in such a way as to capture even more footage of [the minor's] breasts and genitals."  *Id.* at 193.  Although the minor's "breasts and genitals are visible at various points," she never engages in any sexual conduct or displays any inclination to do so.  *Id.* at 188.

Nevertheless, we ruled that the video's objective characteristics constituted a "lascivious exhibition" of the genitals.  *See Courtade*, 929 F.3d at 192-93.  We explained that "lascivious exhibition" means "a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer."  *Id.* at 192.  Applying that definition to the video at issue, we ruled that the extensive nudity, which was "entirely the product of an adult man's deceit, manipulation, and direction," made it clear that "the video's purpose was to excite lust or arouse sexual desire."  *Id*.  Thus, our conclusion in *Courtade* — that a lascivious exhibition exists without any depiction of the minor engaging in sexual conduct or conduct connoting a sex act — cannot be reconciled with *Hillie*'s requirement to the contrary.

We are bound by our *Courtade* precedent.  *See McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (ruling it is a "basic principle that one panel cannot overrule a decision issued by another panel").  Likewise, the trial court did not abuse its discretion by

50

correctly applying the law of this Circuit, and it properly rejected the defendant's legally erroneous request to instruct the jury that "lascivious exhibition" means "depictions showing a minor engaged in . . . hard core sexual conduct." *See* J.A. 3740.

III.

Pursuant to the foregoing, we reject Sanders's various contentions of error and affirm his convictions and sentences.

*AFFIRMED*